PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
———

No. 13-3868
———

FRANCIS X. DOUGHERTY

v.

SCHOOL DISTRICT OF PHILADELPHIA;
LEROY D. NUNERY, II; ESTELLE G. MATTHEWS;
PHILADELPHIA SCHOOL REFORM COMMISSION;
ROBERT L. ARCHIE, JR.; DENISE MCGREGOR
ARMBRISTER; JOHNNY IRIZARRY; JOSEPH A.
DWORETZKY; ANTHONY ANTOGNOLI,
PERSONAL REPRESENTATIVE OF THE ESTATE OF
ARLENE ACKERMAN; JOHN L. BYARS

Leroy D. Nunery, II, Estelle G. Matthews,
Anthony Antognoli, Personal Representative
of the Estate of Arlene Ackerman,

Appellants

———

On Appeal from United States District Court
for the Eastern District of Pennsylvania
(E.D. Pa. No. 2-12-cv-01001)
District Judge: Honorable Juan R. Sanchez

_____

Argued September 9, 2014

Before:  FISHER, JORDAN and HARDIMAN, *Circuit Judges*.

(Filed: November 21, 2014  )

Bacardi L. Jackson, Esq.
Carl E. Jones, Jr., Esq.
Joe H. Tucker, Jr., Esq.
Corey M. Osborn, Esq.
Tucker Law Group
1617 John F. Kennedy Boulevard
Suite 1700
Philadelphia, PA 19103

Christopher A. Lewis, Esq.
Will J. Rosenzweig, Esq.  **ARGUED**
Blank Rome
130 North 18th Street
One Logan Square
Philadelphia, PA 19103

(Counsel for Appellants)

Alice W. Ballard, Esq.
Suite 2135
123 South Broad Street
Philadelphia, PA 19109

Lisa A. Mathewson, Esq. ***ARGUED***
Suite 810
123 South Broad Street
Philadelphia, PA 19109

(Counsel for Appellees)
———

OPINION OF THE COURT
———

FISHER, *Circuit Judge*.

Appellee Francis X. Dougherty, a former employee with the School District of Philadelphia, was terminated after publicly disclosing the alleged misconduct of the School District's Superintendent in steering a prime contract to a minority-owned business. Dougherty filed suit in the United States District Court for the Eastern District of Pennsylvania, alleging First Amendment retaliation and violations of the Pennsylvania Whistleblower Law. Appellants challenge the District Court's denial of their motions for summary judgment on the basis of qualified immunity. We will affirm.

I.

A.

Francis X. Dougherty previously served as the Deputy Chief Business Officer for Operations and Acting Chief of Operations for the Office of the Deputy Superintendent within the School District of Philadelphia. In this role, Dougherty was accountable for the School District's operational departments, including the Office of Capital Programs ("OCP"). OCP developed projects and solicited

bids for all capital works within the School District, subject to the School Reform Commission's ("SRC") approval. Dougherty reported to Deputy Superintendent Dr. Leroy Nunery, who in turn reported to Superintendent Dr. Arlene Ackerman.

On September 2, 2010, Dr. Ackerman directed OCP to install new security cameras across the School District's nineteen "persistently dangerous" schools. Dougherty was instructed to lead the procurement process, which was to be completed within 30 to 60 days. Due to the short time frame, OCP could not utilize its usual competitive bidding process. Therefore, pursuant to School District policy, OCP was required to select a pre-qualified contractor, i.e., a contractor with an existing contract with the School District or another state agency that was obtained through a competitive bid. Dougherty and his team identified Security and Data Technologies, Inc. ("SDT") as one such contractor.

After Dougherty's team prepared a proposal and drew up an implementation plan with SDT for the camera project, Dougherty submitted a completed resolution to Dr. Nunery for review. Pursuant to School District policy, the Superintendent is required to approve the resolution before it is presented to the SRC for consideration and final approval. In this instance, Dougherty did not receive a response from either Dr. Nunery or Dr. Ackerman, nor was the resolution presented to the SRC at its next meeting.

Rather, on September 23, 2010, Dr. Ackerman convened a meeting with Dougherty, Dr. Nunery, and several other operations employees. Dr. Ackerman allegedly rejected the SDT proposal for lack of minority participation and directed that IBS Communications, Inc. ("IBS"), a minority-owned firm, be awarded the prime contract instead. IBS was not a pre-qualified contractor and was therefore ineligible for

no-bid contracts. However, Dr. Ackerman submitted IBS's implementation plan to the SRC for review at its October 13 meeting, and the SRC ratified the plan at its voting meeting on October 20.

At the September 23 meeting, Dr. Ackerman also transferred management responsibility for the camera project to the School District's Procurement Director, whose department did not ordinarily handle this type of project. Subsequently, Dougherty was not included in a camera project personnel meeting called by Dr. Nunery in November 2010 to discuss a complaint made by IBS. Dr. Nunery criticized the staff and blamed Dougherty for obstructing IBS's work. An upset Dougherty sent Dr. Nunery an email rejecting his allegations and requesting to discuss the issue.

On November 10, 2010, Dougherty met with reporters from *The Philadelphia Inquirer* concerning Dr. Ackerman's alleged wrongdoing in connection with the IBS contract. On November 28, *The Philadelphia Inquirer* published an article headlined, "Ackerman Steered Work, Sources Say." App. 208-11. It was the first of several articles accusing Dr. Ackerman of steering the contract to IBS in violation of state guidelines and School District policies and procedures. Dougherty also submitted a report to the FBI Tips and Public Leads website, contacted several state representatives, and submitted a hotline report to the Office of Inspector General for the U.S. Department of Education.

The day after *The Philadelphia Inquirer* article was published, Dougherty was called to a meeting with Dr. Ackerman and Dr. Nunery. Dr. Ackerman vowed to get to the bottom of who leaked the information and stated she could fire Dougherty over this information getting to the press. On December 13, Dr. Ackerman and her direct reports decided a full-blown investigation was needed, and, in an

5

effort initiated by Dr. Ackerman, placed Dougherty and five others on administrative leave pending the investigation. When Estelle Matthews, the School District's senior-most human resources executive, suspended Dougherty, Dougherty told Matthews that he was in fact the leak and had already gone to federal law enforcement agencies.

Several days later, Dr. Ackerman hired Michael Schwartz of Pepper Hamilton LLP ("Pepper Hamilton") to conduct the investigation. There is a significant factual dispute as to the nature of the investigation. Dougherty contends that Dr. Ackerman specifically instructed Schwartz to find the source of the leak. Schwartz maintains, however, that the scope of the investigation was limited to discovering "[a]ll of the facts surrounding the decision to award these contracts . . . [and] whether anyone at the School District had violated School District policies or Pennsylvania or federal [laws]." App. 14 (first alternation in original). The relevant confidentiality provision of the School District's Code of Ethics provides: "A School District employee shall not disclose confidential information concerning property, personnel matters, or affairs of the [School] District or its employees, without proper authorization . . . . Nothing in this provision shall be interpreted as prohibiting the practice of 'whistle-blowing.'" App. 192.

In March 2011, Pepper Hamilton issued its report, concluding that there was no evidence of unlawful motive in the award of the IBS contract. Pepper Hamilton did find, however, that Dougherty violated the Code of Ethics by emailing information about the SDT proposal to an unknown

email address[1] before the September 23 meeting. The investigation also revealed that Dougherty emailed large volumes of confidential information related to the camera project to his personal email address—which is not a violation of the Code of Ethics per se—beginning on November 10.

Following the investigation, Dougherty was notified that the School District was recommending his termination to the SRC. It explained that Dougherty had breached (or, the School District alleged, attempted to breach) the confidentiality section of the Code of Ethics when he forwarded emails to an unknown email address and to his personal email address. It also emphasized that Dougherty's refusal to cooperate in the investigation—after he had been suspended and retained a lawyer—prevented the School District from reaching any other conclusion. On April 27, 2011, the SRC terminated Dougherty.

B.

On February 24, 2012, Dougherty filed a complaint against the School District of Philadelphia, Dr. Ackerman, Dr. Nunery, Matthews, the SRC, and four individual SRC members[2] in the Eastern District of Pennsylvania. He claimed that Appellants terminated him in retaliation for his disclosure of Dr. Ackerman's alleged misconduct to *The Philadelphia Inquirer* and law enforcement agencies, in violation of the First Amendment under 42 U.S.C. § 1983 and

---

[1] Dougherty claims the email account is a personal email address, which the District Court accepted for purposes of summary judgment. The Pepper Hamilton investigation never determined to whom the email account belonged.

[2] The claims against the SRC and the SRC members were dismissed.

7

Pennsylvania's Whistleblower Law, 43 Pa. Stat. Ann. § 1421, *et seq.*

In August 2013, the School District, Dr. Nunery, and Matthews filed a joint motion for summary judgment and asserted the defense of qualified immunity as to Dougherty's First Amendment retaliation claim. Anthony Antognoli, on behalf of the estate of Dr. Ackerman,[3] filed a motion for summary judgment one month later and asserted the same defense. The District Court held that the summary judgment record was sufficient to show a violation of a clearly established constitutional right, and it denied both motions in an order submitted September 18, 2013. Dr. Nunery, Matthews, and Antognoli filed this interlocutory appeal challenging the denial of summary judgment on qualified immunity grounds. The District Court further elucidated its order with a supplemental opinion.

Viewing the facts in the light most favorable to Dougherty, the District Court explained that Dougherty's allegations were sufficient to establish a First Amendment retaliation claim. First, it found no evidence "suggesting [Dougherty's speech] fell within the scope of his duties to recognize the alleged misconduct as such and report it," App. 24, and, therefore, concluded that Dougherty spoke as a citizen under *Garcetti v. Ceballos*, 547 U.S. 410 (2006). Second, it found no evidence "compel[ling] a conclusion that Dougherty and [Appellants] had such close working relationships that his reports to the press would undermine their ability to work together," tipping the balancing test established in *Pickering v. Board of Education*, 391 U.S. 563

---

[3] Dr. Ackerman passed away in February 2013. Anthony Antognoli, the representative of her estate, was substituted as a defendant in August 2013.

8

(1968), in his favor. App. 27. Finally, the District Court found that Appellants' motivation for firing Dougherty was a disputed issue of material fact,[4] and concluded that Dougherty made a sufficient showing of improper motivation to put the issue before a jury.

Turning to whether the right was clearly established, the District Court found that a reasonable governmental official would have been on notice that retaliating against Dougherty's speech was unlawful. Thus, it concluded that Appellants were not entitled to qualified immunity. The District Court stayed its proceedings pending this appeal.

## II.

The District Court properly exercised jurisdiction under 28 U.S.C. § 1331, and this Court has jurisdiction under 28 U.S.C. § 1291 pursuant to the collateral order doctrine. Under the collateral order doctrine, an interlocutory order is immediately appealable as a "final decision" within the meaning of § 1291 if it "[1] conclusively determine[s] the disputed question, [2] resolve[s] an important issue completely separate from the merits of the action, and [3] [is] effectively unreviewable on appeal from a final judgment." *Johnson v. Jones*, 515 U.S. 304, 310 (1995) (internal quotation marks omitted) (first, third, and fifth alternations in original). It is well established that an order denying summary judgment on qualified immunity grounds may qualify as an appealable final decision under the collateral order doctrine. *See Mitchell v. Forsyth*, 472 U.S. 511, 526-

---

[4] As the District Court explained, a reasonable jury could find that Appellants' explanation for terminating Dougherty was pretextual: the Code of Ethics did not prohibit taking work home and, regardless, made an exception for whistleblowing.

9

530 (1985). However, appellate jurisdiction exists only "to the extent that [the order] turns on an issue of law." *Id.* at 530.

Accordingly, for each of Appellants' claims, "we possess jurisdiction to review whether the set of facts identified by the district court is sufficient to establish a violation of a clearly established constitutional right[;]" however, "we lack jurisdiction to consider whether the district court correctly identified the set of facts that the summary judgment record is sufficient to prove." *Ziccardi v. City of Phila.*, 288 F.3d 57, 61 (3d Cir. 2002); *see also Monteiro v. City of Elizabeth*, 436 F.3d 397, 405 (3d Cir. 2006) ("[W]hen qualified immunity depends on disputed issues of fact, those issues must be determined by the jury.").

To the extent we have jurisdiction, this Court exercises plenary review over an appeal from a denial of summary judgment based on a lack of qualified immunity. *Reilly v. City of Atl. City*, 532 F.3d 216, 223 (3d Cir. 2008). A court may grant summary judgment only when the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether there is a genuine issue of fact for trial, "[w]e must view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion . . . ." *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005).

III.

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012). The qualified immunity analysis is a two-step process, which a court may address in either order

10

according to its discretion. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Here, we first decide whether the facts, taken in the light most favorable to Dougherty, establish that the Appellants' conduct "violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Second, we determine whether that right was "clearly established" at the time of the challenged conduct. *Id.*

A.

Under the first prong of the qualified immunity analysis, we must decide whether a constitutional violation—here, First Amendment retaliation—was established based on the facts identified by the District Court. "[A] State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." *Rankin v. McPherson*, 483 U.S. 378, 383 (1987). To establish a First Amendment retaliation claim, a public employee must show that (1) his speech is protected by the First Amendment and (2) the speech was a substantial or motivating factor in the alleged retaliatory action, which, if both are proved, shifts the burden to the employer to prove that (3) the same action would have been taken even if the speech had not occurred. *See Gorum v. Sessoms*, 561 F.3d 179, 184 (3d Cir. 2009).

We need not reach the second and third elements of Dougherty's First Amendment retaliation claim, which present questions of fact and are not contested in this appeal. The District Court concluded that Dougherty adduced sufficient evidence to present these questions to a jury, and we do not have jurisdiction to review that conclusion under the collateral order doctrine. *See Reilly*, 532 F.3d at 232-33; *Monteiro*, 436 F.3d at 405.

Rather, central to the question presented here, we focus on whether the set of facts identified by the District

11

Court establishes that Dougherty's speech is entitled to protection by the First Amendment. This is a question of law, appropriate for appellate review. *Connick v. Myers,* 461 U.S. 138, 148 n.7 (1983).

As the Supreme Court has reiterated time and time again, "free and unhindered debate on matters of public importance" is "the core value of the Free Speech Clause of the First Amendment." *Pickering*, 391 U.S. at 573. Accordingly, "public employees do not surrender all their First Amendment rights by reason of their employment." *Garcetti*, 547 U.S. at 417. At the same time, the Supreme Court also aptly recognizes the government's countervailing interest—as an employer—in maintaining control over their employees' words and actions for the proper performance of the workplace. *See id.* at 418-19. Thus, "[s]o long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively." *Id.* at 419.

With this backdrop, we conduct a three-step inquiry to determine whether a public employee's speech is protected: first, the employee must speak as a citizen, not as an employee, under the test established in *Garcetti* and recently reiterated by the Supreme Court in *Lane v. Franks*, __ U.S. __, __, 134 S. Ct. 2369, 2378-80 (2014); second, the speech must involve a matter of public concern, which is here

undisputed;[5] and third, the government must lack an "adequate justification" for treating the employee differently than the general public based on its needs as an employer under the *Pickering* balancing test. *Gorum*, 561 F.3d at 185 (internal quotation marks omitted). We address the *Garcetti* and *Pickering* inquiries in turn.

1

*i.*

*Garcetti* establishes that when public employees speak "pursuant to their official duties," that speech does not receive First Amendment protection. 547 U.S. at 421. This is because, when doing so, "employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* The rationale underlying this distinction "promote[s] the individual and societal interests that are served when employees speak as citizens on matters of public concern," while "respect[ing] the needs of government

---

[5] Speech involves a matter of public concern when, considering the "content, form, and context of a given statement," it can "be fairly considered as relating to any matter of political, social, or other concern to the community." *Connick*, 461 U.S. at 146, 147-48. As we have long recognized, "[d]isclosing corruption, fraud, and illegality in a government agency is a matter of significant public concern." *Feldman v. Phila. Hous. Auth.*, 43 F.3d 823, 829 (3d Cir. 1994). The District Court and the parties agree that Dougherty's report to *The Philadelphia Inquirer* exposing the School District's alleged impropriety in the award of the IBS contract implicates a matter of public concern. We also agree and need not belabor the point here.

employers attempting to perform their important public functions." *Id.* at 420.

In *Garcetti*, the Supreme Court held that a prosecutor's internal memorandum advising his supervisors of the disposition of a pending case was speech made pursuant to his official duties. *Id.* at 420-21. It reasoned that writing the memo was part of the prosecutor's "daily professional activities" as a government employee, distinguishable from "the kind of activity engaged in by citizens who do not work for the government." *Id.* at 422, 423. Finding that the prosecutor did not speak as a citizen, therefore, "simply reflect[ed] the exercise of employer control over what the employer itself has commissioned or created." *Id.* at 422.

The *Garcetti* Court explicitly declined to advance a framework for defining when an employee speaks pursuant to his official duties, explaining that "[t]he proper inquiry is a practical one." *Id.* at 424. This reflects "the enormous variety of fact situations" in which a public employee claims First Amendment protection. *Id.* at 418 (quoting *Pickering*, 391 U.S. at 569).

This Court has given contours to *Garcetti*'s practical inquiry for defining the scope of an employee's duties. We declined to extend First Amendment protection to speech where public employees were required to take the speech "up the chain of command," *Foraker v. Chaffinch*, 501 F.3d 231, 241-43 (3d Cir. 2007) (holding that police officers' statements concerning hazardous conditions at a firing range were made within their official duties since they were obligated to report that type of information up the chain of command), *abrogated on other grounds by Borough of Duryea v. Guarnieri*, 131 S. Ct. 2488 (2011), and where an employee's technically-off-duty speech related to "special knowledge" or "experience" acquired through his de facto job

duties, *Gorum*, 561 F.3d at 185-86 (internal quotation marks omitted) (holding that a professor's speech at a student's disciplinary hearing was made within his official duties since the professor had special knowledge and experience with the university's disciplinary code as a de facto advisor to students with disciplinary issues). "[W]hether a particular incident of speech is made within a particular plaintiff's job duties is a mixed question of fact and law." *Foraker*, 501 F.3d at 240.

Applying *Garcetti*'s test to the facts the District Court identified in the light most favorable to Dougherty, we agree that Dougherty did not speak "pursuant to his official duties" when he disclosed details of Dr. Ackerman's alleged misconduct in awarding the prime contract to IBS. The District Court found no evidence that Dougherty's communication with *The Philadelphia Inquirer* fell within the scope of his routine job responsibilities at the School District. Unlike the employees in *Garcetti*, *Foraker*, and *Gorum*, "nothing about Dougherty's position compelled or called for him to provide or report this information," whether to the School District, the press, or any other source. App. 24. To the contrary, the School District appears to *discourage* such speech through its Code of Ethics' confidentiality provision, which is being used to justify Dougherty's termination in the instant case. Dougherty's report to *The Philadelphia Inquirer*, therefore, was made as a citizen for First Amendment purposes and should not be foreclosed from constitutional protection.

Faced with the District Court's application of *Garcetti*, and precluded from challenging the factual sufficiency of the summary judgment record, *see Ziccardi*, 288 F.3d at 61, 63, Appellants instead allege that the District Court failed to use the proper legal standard. They replace *Garcetti*'s "pursuant to official duties" test with one that precludes First

15

Amendment protection for speech that "owes its existence to a public employee's professional responsibilities." *See* Appellants' Br. at 15 (quoting *Garcetti*, 547 U.S. at 421-22). After plucking *Garcetti*'s language to canonize a new standard, Appellants rely on *Gorum* to argue that, because the content of Dougherty's speech was gained from "special knowledge" and "experience" with the camera project entrusted to Dougherty, his speech "owes its existence to" his professional duties.

These arguments ask us to read *Garcetti* far too broadly. This Court has never applied the "owes its existence to" test that Appellants wish to advance, and for good reason: this nearly all-inclusive standard would eviscerate citizen speech by public employees simply because they learned the information in the course of their employment, which is at odds with the delicate balancing and policy rationales underlying *Garcetti*.

To this end, it bears emphasis that whether an employee's speech "concern[s] the subject matter of [his] employment" is "nondispositive" under *Garcetti*. 547 U.S. at 421. This is because the First Amendment necessarily "protects some expressions related to the speaker's job." *Id.* In fact, as the Supreme Court recently reiterated, speech by public employees "holds special value *precisely because* those employees gain knowledge of matters of public concern through their employment." *Lane*, 134 S. Ct. at 2379 (emphasis added); *see also City of San Diego v. Roe*, 543 U.S. 77, 80 (2004) (per curiam) (observing, in the public concern context, that public employees are "uniquely qualified to comment" on "matters concerning government policies that are of interest to the public at large"); *Pickering*, 391 U.S. at 572 ("Teachers are, as a class, the members of a community most likely to have informed and definite opinions as to how

16

funds allotted to the operations of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal.").

Moreover, Appellants misread *Gorum*'s holding. We reemphasized in *Gorum* that *Garcetti*'s "pursuant to official duties" test requires a practical inquiry. 561 F.3d at 185; *see also Foraker*, 501 F.3d at 240 (describing the nature of the practical inquiry as "fact-intensive"). We concluded that, although advising at disciplinary hearings was not listed in the professor's formal job description, his extensive knowledge and experience with disciplinary actions as a de facto disciplinary advisor rendered that speech within his job duties nonetheless. *Gorum*, 561 F.3d at 186; *cf. Garcetti*, 547 U.S. at 425 ("[L]isting of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes."). Accordingly, Appellants' attempt to preclude First Amendment protection from Dougherty's report—a duty absent from both his de facto and de jure responsibilities—is inapt.

*ii.*

In addition, taking this opportunity to respond to the parties' differing interpretations of the Supreme Court's recent decision in *Lane*, we conclude that *Lane* reinforces *Garcetti*'s holding that a public employee may speak as a citizen even if his speech involves the subject matter of his employment.

In *Lane*, the Supreme Court held that truthful sworn testimony, compelled by subpoena and made outside the scope of the employee's "ordinary job responsibilities," is protected under the First Amendment. 134 S. Ct. at 2378.

17

Edward Lane, a program director at a community college, was terminated after he was compelled to testify about a former employee's misuse of state funds that he discovered in the course of a financial audit. *Id.* at 2375-76. The Eleventh Circuit held that Lane acted pursuant to his official duties when he investigated and reported the fraud, and, therefore, concluded that his testimony "owe[d] its existence to" his official responsibilities, foreclosing First Amendment protection. *Id.* at 2376-77 (internal quotation marks omitted).

The Supreme Court unanimously reversed this conclusion.[6] It reasoned, like we do, that the Eleventh Circuit "read *Garcetti* far too broadly" by ignoring *Garcetti*'s explicit qualification "that its holding did not turn on the fact that the memo at issue 'concerned the subject matter of [the prosecutor's] employment.'" *Id.* at 2379 (alternation in original) (quoting *Garcetti*, 547 U.S. at 421). After analyzing *Garcetti*, the Court emphasized: "[T]he mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech." *Id.* Rather, "[t]he critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Id.* Thus, *Lane* rejects the very contention Appellants advance.

While *Lane* focused on speech in the context of compelled testimony, *see id.* at 2378-79, Appellants' argument that its holding is limited to that context is misguided. *Cf. Mpoy v. Rhee*, 758 F.3d 285, 294-95 (D.C. Cir. 2014) (applying *Lane* to a teacher's critical emails

---

[6] On the second prong of the qualified immunity analysis, the *Lane* Court affirmed the Eleventh Circuit's holding that the law was not clearly established in that circuit.

18

concerning classroom conditions). The Supreme Court's focus on sworn testimony was in response to the "short shrift" the Eleventh Circuit gave to that speech, which presented a circuit split when compared to this Court's holding in *Reilly v. City of Atlantic City*, 532 F.3d at 231. *Lane*, 134 S. Ct. at 2377, 2378. Even after recognizing that "sworn testimony in this case is far removed from the speech at issue in *Garcetti*," the Court located its rule of decision in *Garcetti* and applied the "critical question" under *Garcetti* to the facts in *Lane*. *Id.* at 2379. If anything, *Lane* may broaden *Garcetti*'s holding by including "ordinary" as a modifier to the scope of an employee's job duties. *See Mpoy*, 758 F.3d at 294-95 ("[T]he use of the adjective 'ordinary'—which the court repeated nine times—could signal a narrowing of the realm of employee speech left unprotected by *Garcetti*."). However, that question is not before us today.

Under *Lane*, our determination stands that Dougherty's report to *The Philadelphia Inquirer* was not made pursuant to his official job duties. Dougherty's claim is not foreclosed merely because the subject matter of the speech concerns or relates to those duties.

2.

Even though we find that Dougherty spoke as a citizen on a matter of public concern, his speech is protected only if the *Pickering* balancing test tilts in his favor. Under *Pickering*, we must "balance . . . the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." 391 U.S. at 568. The more tightly the First Amendment embraces the employee's speech, the more vigorous a showing of disruption must be made by the employer. *McGreevy*, 413 F.3d at 365.

19

On the employee's side of the scale, we must consider the interests of both Dougherty and the public in the speech at issue. *See O'Donnell v. Yanchulis*, 875 F.2d 1059, 1061 (3d Cir. 1989). It is well established that "[s]peech involving government impropriety occupies the highest rung of First Amendment protection." *Swineford v. Snyder Cnty.*, 15 F.3d 1258, 1274 (3d Cir. 1994). Moreover, we have often emphasized that "[t]he public has a significant interest in encouraging legitimate whistleblowing so that it may receive and evaluate information concerning the alleged abuses of . . . public officials." *O'Donnell*, 875 F.2d at 1062; *see also Baldassare v. New Jersey*, 250 F.3d 188, 198 (3d Cir. 2001) ("[T]he public's interest in exposing potential wrongdoing by public employees is especially powerful.").

In the instant case, Dougherty's report to *The Philadelphia Inquirer* exposing Dr. Ackerman's alleged misconduct is the archetype of speech deserving the highest rung of First Amendment protection. Against the public's significant interest in Dougherty's act of whistleblowing, therefore, Appellants "bear a truly heavy burden." *McGreevy*, 413 F.3d at 365.

Weighed on the other side is the government's legitimate and countervailing interest, as an employer, in "promoting workplace efficiency and avoiding workplace disruption." *Id.* at 364. While the test for disruption varies depending upon the nature of the speech, the factors a court typically considers include whether the speech "impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin*, 483 U.S. at 388.

20

In the paradigmatic case finding speech disruptive to a close working relationship, *Sprague v. Fitzpatrick*, this Court held that a First Assistant District Attorney's publicized comments disputing the veracity of the District Attorney's statements "completely undermined" their close working relationship. 546 F.2d 560, 562, 565 (3d Cir. 1976). Because the First Assistant District Attorney functioned as an "alter ego" to the District Attorney as his direct administrative and policy-making subordinate, we concluded that his "irreparable breach of confidence" completely precluded a functional working relationship. *Id.* at 565. On the other hand, we distinguished a case where the director of a discrete division within the Philadelphia Police Department, who enjoyed neither policymaking responsibilities nor the degree of authority comparable to the employee in *Sprague*, was terminated by the Police Commissioner for his speech criticizing the department in *The Philadelphia Inquirer*. *Watters v. City of Phila.*, 55 F.3d 886, 897-98 (3d Cir. 1995).

Here, the District Court found that, while Dougherty was relatively high up in the chain of command as Deputy Chief Business Officer for Operations and Acting Chief of Operations, Dougherty's relationship with Dr. Ackerman and Dr. Nunery was neither close, personal, nor confidential, and that Dougherty never served as an "alter ego" for either. App. 27-28. Despite the breadth of his operations responsibilities, the District Court also found that Dougherty was not a policymaker, but was one of many administrators who merely implemented Dr. Ackerman's policies. App. 28. It found disputed, however, "how much of the disruption [to the School District] was the result of the press leaks" or the result of Appellants' subsequent actions—hiring Pepper Hamilton, suspending six administrators, and ultimately terminating Dougherty—to find the source of the leak. App. 28. Viewing

21

the evidence in the light most favorable to Dougherty, the District Court concluded that any disruption to the School District was outweighed by the substantial public interest in exposing government misconduct, tipping the *Pickering* balancing test in Dougherty's favor.

Considering the facts in the same light, we must agree. As a preliminary matter, none of the factors this Court uses as a proxy for disruption are present here. First, based on the District Court's reading of the record, the evidence does not compel the conclusion that Dougherty's relationship with Dr. Ackerman or Dr. Nunery is "the kind of close working relationship[] for which it can persuasively be claimed that personal loyalty and confidence are necessary to [its] proper functioning." *Pickering*, 391 U.S. at 570. Dougherty alleges that he never spoke directly to Dr. Ackerman before the camera project, App. 26, and, even if we assume that Dougherty accepted such a relationship when he was appointed to lead the project, he did not occupy that position at the time the speech was made. *Cf. Baldassare*, 250 F.3d at 199 (finding that the employee's demotion before he spoke "belie[d] a comparison to the undoing of a 'close working relationship' in *Sprague*"). Dougherty was not even called to Dr. Nunery's meeting to discuss the camera project a few weeks before the disclosure. As we stressed in *Watters*, "merely saying that the relationship will be undermined does not make it so." 55 F.3d at 897-98.

Nor was Dougherty's speech likely to impair discipline by superiors or harmony among co-workers, impede the performance of his daily duties, or interfere with the regular

22

operation of the School District.[7]  We emphasize that we may not consider Appellants' claims to the extent they challenge the factual dispute concerning the cause of the disruption to the School District—the speech or the retaliation.  *See Ziccardi*, 288 F.3d at 61.  We agree with the District Court, simply, that a reasonable jury could conclude that Dougherty's speech would have made only a minimal disruption had the School District not subsequently engaged Pepper Hamilton, suspended six administrators, and fired Dougherty.  It is against this Court's precedent to find against an employee where the disruption "was primarily the result, not of the plaintiff's exercise of speech, but of his superiors' attempts to suppress it."  *Czurlanis v. Albanese*, 721 F.2d 98, 107 (3d Cir. 1983).

Finally, while the parties do not dispute that there was some actual disruption to the School District, we also keep in mind that "it would be absurd to hold that the First Amendment generally authorizes corrupt officials to punish subordinates who blow the whistle simply because the speech somewhat disrupted the office."  *Id.* (internal quotation marks omitted).  Some disruption is almost certainly inevitable; the point is that *Pickering* is truly a balancing test.  *See id.*

For summary judgment purposes, we agree with the District Court that Dougherty's speech is entitled to First Amendment protection and, accordingly, that Dougherty has sufficiently established the existence of a constitutional violation.

---

[7] *See Watters*, 55 F.3d at 896 (holding that it is no longer essential to show actual disruption if the government shows disruption is likely).

B.

Having found a violation of Dougherty's First Amendment rights, the second prong of the qualified immunity analysis requires us to determine whether that right was "clearly established." "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. To be clearly established, the very action in question need not have previously been held unlawful. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Rather, the "contours of the right" must be sufficiently clear such that the unlawfulness of the action is apparent in light of pre-existing law. *Id.* Whether a right is clearly established is a question of law, appropriate for our review under the collateral order doctrine. *Mitchell*, 472 U.S. at 528.

Viewing the facts the District Court identified in the light most favorable to Dougherty, we find that the illegality of the Appellants' actions was sufficiently clear in the situation they confronted. Since at least 1967, "it has been settled that a State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick*, 461 U.S. at 142; *see also Rankin*, 483 U.S. at 383 (finding the same principle "clearly established"). In the case at bar, Dougherty's particular type of speech—made as a concerned citizen, purporting to expose the malfeasance of a government official with whom he has no close working relationship—is exactly the type of speech deserving protection under the *Pickering* and *Garcetti* rules of decision and our subsequent case law. *See, e.g.*, *Pickering*, 391 U.S. at 566 (protecting speech by teacher to local newspaper criticizing the school board and the superintendent's allocation of school funds); *O'Donnell*,

24

875 F.2d at 1060, 1061-63 (protecting speech by chief of police to local television station that accused township supervisors of various corrupt practices, legal improprieties, and abuses of their positions); *Watters*, 55 F.3d at 897-98 (protecting speech by program manager to local newspaper criticizing departmental program the employee oversaw where dispute existed over cause of disruption); *Baldassare*, 250 F.3d at 199-200 (protecting investigation into alleged wrongdoing of law enforcement officers where there was no "alter ego" relationship). Thus, Appellants had fair notice that their retaliation against Dougherty's constitutionally protected speech would not be shielded by qualified immunity.

Appellants contend that their actions were "so close to the constitutional line that it was eminently reasonable for them to conclude they had failed to cross it," since the case law puts equally heavy emphasis on the employer's right to avoid disruption. Appellants' Br. at 27, 29. We find this contention unpersuasive. While it is true that both *Garcetti* and *Pickering* are fact-dependent inquiries, giving some leeway for termination based on disruptive speech if made pursuant to an employee's job duties, we cannot conduct our analysis with Appellants' desired version of the facts. We must review the District Court's analysis based on the facts it identified. *See Ziccardi*, 288 F.3d at 61. Given the citizen-like nature of Dougherty's disclosure to *The Philadelphia Inquirer*, the lack of close working relationships with either Dr. Ackerman or Dr. Nunery, and the disputed issue of fact with regard to the cause of the disruption, it is sufficiently clear that Dougherty's speech was protected under the First Amendment. "When the balance of cognizable interests weighs so heavily in an employee's favor, our cases make plain that the law is clearly established." *McGreevy*, 413 F.3d

25

at 367.   We conclude, therefore, that Appellants are not entitled to qualified immunity.

## IV.

For the foregoing reasons, we will affirm the District Court's order denying Appellants' motions for summary judgment on qualified immunity grounds.