NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 22-2649
_____

SONDRA DENNISON,
Appellant

v.

INDIANA UNIVERSITY OF PENNSYLVANIA;
THOMAS SEGAR; MICHAEL DRISCOLL

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 2-20-cv-01563)
District Judge:  Honorable Marilyn J. Horan

Submitted Under Third Circuit L.A.R. 34.1(a)
September 14, 2023

Before:   JORDAN, BIBAS, and PORTER, *Circuit Judges*

(Filed: December 12, 2023)

_____

OPINION*
_____

JORDAN, *Circuit Judge*.

Appellant Sondra Dennison sued her supervisor, Thomas Segar, and Michael

Driscoll, the President of Indiana University of Pennsylvania (the "University")

---

* This disposition is not an opinion of the full court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

(collectively, the "Appellees"), over her termination as Director of Residence Life at the University. She alleges that she was illegally fired because of her sex and age, or in retaliation for First Amendment protected speech about the COVID-19 pandemic. Even accepting Dennison's version of the events, however, she has not met her burden of showing that what occurred rose to a violation of her civil rights, so we will affirm the District Court's entry of summary judgment against her.

## I. BACKGROUND[1]

### A. Facts

Dennison, who was 53 years old at the time of the events at issue, began working for the University in 2007 as the Assistant Dean of Students, Associate Director of Residence Life. In late 2012, she was promoted to Director of Residential Living, after which her title and responsibilities expanded to be the Executive Director of Housing, Residential Living and Dining in 2016. In 2019, her new boss, defendant-appellee Thomas Segar, the Vice President of Student Affairs, made some organizational changes. That reorganization included changing Dennison's position to Director of Residence Life and promoting another woman, Valeri Baroni, to be Director of Housing and Dining.

---

[1] The facts below are mainly taken from Dennison's proffered evidence in discovery since "[t]he evidence of the non-movant is to be believed" on summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). We also draw "all justifiable inferences … in [her] favor." *Id.* But we do not accept "[b]are assertions, conclusory allegations, or suspicions[.]" *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288-89 (3d Cir. 2018).

On Monday, March 16, 2020, the University announced its transition to online learning, necessitated by the COVID-19 pandemic. Segar emailed his Student Affairs staff, which included Dennison and Baroni, instructing that "[a]ll residential students will be asked to move out of the residence halls by" the weekend. (J.A. at 511.) Because of the pandemic, Dennison was concerned about the health and well-being of the University employees who reported to her.[2] She therefore came up with the idea of an "express checkout" whereby students could "drop off keys and leave without interacting with staff." (Opening Br. at 10.) Before implementing that process, however, Dennison suggested the idea to Baroni, who rejected it as impractical because Baroni wanted to get a head count of students leaving campus.[3] Baroni said that if Dennison disagreed, she should talk with Segar, which Dennison did that day.

Dennison first emailed Segar, saying that

> The [Residence Life] staff is an inch in front of a meltdown. They are feeling vulnerable to whatever might be floating around. I've asked Val [Baroni] if we can do a virtual checkout (similar to checking out of a hotel) and she doesn't think that's possible, but suggested I call you. Thoughts?

---

[2] Dennison testified that her staff were feeling "vulnerable" and "disrespected … as though the [U]niversity d[id] not care for them[.]" (J.A. at 394.)

[3] It is unclear from the record what overlap of responsibilities Dennison and Baroni had with respect to resident checkouts. Dennison's title included "Residence Life," and Baroni's title included "Housing." Segar testified in his deposition that the "checkouts [were] under the guidance and responsibilities of Valerie Baroni[,]" and that the "process is owned by housing and dining." (J.A. at 853.) But Segar also testified that employees Dennison supervised "were the ones responsible for the process within their residence halls." (*Id.*)

3

(J.A. at 519.)  Eager to get a response, she then went directly to Segar's office to tell him what was happening with her staff, and to express desire to have an express checkout.  She told Segar that Baroni opposed it but that "it was the best option" and "in the best interest of the students and the staff[.]"  (J.A. at 395.)  Segar resisted the idea initially and suggested that her staff take leave if they didn't want to work on campus; Dennison pushed back, saying it would be unfair to require them to take personal, instead of paid administrative leave, as they would still be working, just remotely rather than in person.  At the end of the conversation, Segar, "in frustration[,]" relented and directed Dennison to just "do what you think you have to do."  (J.A. at 396.)

The next day, Friday, March 20, she implemented the express checkout plan.  She conducted a Zoom call in the morning to announce the plan to her staff.  Other relevant campus entities like the University Police, the Health Center, and Information Technology also attended.  On the call, she dismissed student staff that normally helped with the student check out process and informed the residence directors that reported to her that they were responsible for remotely handling any calls and questions related to their residence halls.  After the call, she emailed Segar, with Baroni copied, informing him that they had closed the desks, sent staff home, and would allow the Residence Directors to work from their apartments.  She noted that they had posted a number at each desk that parents and residents could call for checkout assistance.

4

Baroni had logged on to the end of the Zoom call to hear Dennison dismiss her staff to work remotely, which led to a "confrontation" between the two because Baroni "felt as though everything had been kind of dropped in the lap of [her and her] staff[.]" (J.A. at 397, 965.) Emotions were high. Baroni swore at Dennison, and she acknowledged that, when she later called Segar to tell him what was happening, her "voice was shaking." (J.A. at 397, 965, 968.) Segar was also "very upset" when he called Dennison to ask her what happened, expressing concern that "the housing office was in a tailspin" because the residence desks were unstaffed. (J.A. at 398-99.) He said that "he felt [her] decision was based on emotion," that "responding emotionally was a pattern with [her,]" and that "rather than being concerned for [her] staff's safety, [she] was responding to their emotional pleas[.]" (J.A. at 398.) He admonished that "he expected more from someone with [her] years of experience[.]" (J.A. at 414.) After that rebuke, "Segar stopped communicating with [Dennison.]" (J.A. at 400.) A week later, on March 31, Dennison was given a letter from the university president, defendant-appellee Michael Driscoll, telling her she was fired.

Prior to Dennison's termination, President Driscoll held a meeting with senior administrators and advised them that, in light of the pandemic shutdown and the University's "financial situation," they should consider which employees could be discharged. (J.A. at 908.) Associate Vice President of Human Resources Craig Bickley understood from Driscoll that the firings would focus on employees at the "manager 200 level and above" because they were at-will employees and

5

made higher salaries. (J.A. at 712, 909, 911.) Bickley also testified that the phrase "dead wood" was used in the meeting to refer to those "that [the University] needed to get rid of[.]" (J.A. at 908.)

Dennison's position was classified as "Manager 210," and she "serve[d] at the pleasure of the President." (J.A. at 191, 532.) Segar recommended that she be discharged. Four or five other names came up in the discharge conversation, but only one other person, Donald Woolslayer – a man in his late 50s – was fired along with Dennison.[4] Dennison was the oldest at-will employee not covered by a collective bargaining agreement in Student Affairs and was the only one fired from that division.

Driscoll testified that they were looking for "[p]laces where [they] had employees … underperforming relative to … expectations, and places where [they] had the flexibility to reduce the employees." (J.A. at 709.) He affirmed

---

[4] Woolslayer was the Director of Facilities Operations for the University and filed a civil rights action against Driscoll in both Driscoll's individual and official capacities, for retaliatory termination in violation of his First Amendment rights for speaking out about COVID-19. Against the recommendation of the University's Human Resources Department, Woolslayer had emailed colleagues informing them of the existence of a credible risk of contracting COVID-19 and advised them to seek medical advice. Driscoll terminated him the next day in a letter (similar to one sent to Dennison) saying that University senior leadership had "lost confidence in [Woolslayer's] ability to effectively perform [his] assigned duties[.]" (J.A. at 559) (alterations in original). The district court in that case denied Driscoll's motion to dismiss because Woolslayer had adequately pled that "he spoke as a citizen on a matter of public concern" unrelated to his duties as Director of Facilities. *Woolslayer v. Driscoll*, No. 2:20-cv-00573-PLD, 2020 WL 5983078, at *4 (W.D. Pa. Oct. 8, 2020). A day later – a week before Dennison filed her complaint – Driscoll settled with Woolslayer.

that Dennison's division was "heavy in the number of senior management positions" and that they had "concerns about Dr. Dennison's ability to perform at the level of her position[,]" including "leadership, ability to management [sic] the nuance and flexibility required at that level[.]" (J.A. at 709.) Driscoll had at least three conversations surrounding the decision to terminate Dennison. Part of that was based on Segar's report that "the contact-free checkout was implemented by Dr. Dennison without consulting" him.[5] (J.A. 710.) Driscoll "shared [Segar's] concern in … Dennison not … consulting with [Segar] before reaching a decision that was very significant regarding the deployment of [University] employees during the pandemic." (J.A. at 710.) Accordingly, Driscoll's letter to Dennison stated that "senior leadership and I have lost confidence in your ability to effectively perform your assigned duties" so "[y]our employment with Indiana University of Pennsylvania is terminated effective immediately, as of March 31, 2020." (J.A. at 532.)

---

[5] Segar does not deny the email evidence in the record that Dennison had indeed consulted him – as in, she "asked [his] advice or opinion." *See Consult*, Merriam-Webster's Collegiate Dictionary (10th ed. 2002); *see also Consultation*, *Black's Law Dictionary* (11th ed. 2019) ("The act of asking the advice or opinion of someone[.]"). But he insists that she implemented her express checkout plan without his *approval*, which, in his opinion, justified his recommendation to President Driscoll to terminate Dennison. Drawing the inference in Dennison's favor, we assume that Segar misrepresented to President Driscoll that Dennison did not "consult" him – as that term is ordinarily understood – and that President Driscoll relied on that representation at least in part in terminating Dennison.

Dennison's position was offered first to a woman 14 years younger than her, who turned it down. Segar then moved Dennison's former staff and Residence Life responsibilities under Baroni's department, Housing and Dining, after which Baroni accordingly received a salary increase and reclassification. Baroni is 17 years younger than Dennison.

## B.    Procedural History

After exhausting her administrative remedies with the Equal Employment Opportunity Commission, Dennison filed a complaint against Segar and Driscoll in the District Court. She later filed the amended complaint that is the operative pleading here. She sought relief under 42 U.S.C. § 1983 for violation of her rights under the First Amendment, alleging that Segar and Driscoll retaliated against her for speaking out about a matter of public concern.[6] She also alleged sex discrimination under Title IX of the Education Amendments of 1972, 86 Stat. 235, 373, as amended, 20 U.S.C. § 1681 et seq. ("Title IX"), sex discrimination under Title VII of the Civil Rights Act of 1964, 78 Stat. 241, 253, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"), and age discrimination under the Age Discrimination in Employment Act of 1967, 81 Stat. 602, as amended, 29 U.S.C. § 621 et seq. ("ADEA").[7]

---

[6] Dennison sued both Segar and Driscoll in their official and individual capacities, seeking an injunction in their official capacities and money damages in their individual capacities.

[7] Dennison also brought claims under the Rehabilitation Act of 1973, 87 Stat. 355, 29 U.S.C § 794, and the Americans with Disabilities Act of 1990, 104 Stat. 327, 42 U.S.C. § 12101 et seq. for alleged discrimination and lack of accommodation for a medical condition, temporomandibular joint dysfunction, commonly known as "TMJ."

The District Court granted summary judgment for the defendant-appellees as to all counts and claims. This timely appeal followed.

## II.   DISCUSSION[8]

### A.   First Amendment Retaliation

To prevail on a First Amendment retaliation claim under 42 U.S.C. § 1983, a plaintiff must prove not only that "(1) [she] engaged in constitutionally protected conduct," but also that "(2) the defendant engaged in retaliatory action sufficient to deter a person of ordinary firmness from exercising [her] constitutional rights, and (3) a causal link [existed] between the constitutionally protected conduct and the retaliatory action." *Javitz v. Cnty. of Luzerne*, 940 F.3d 858, 863 (3d Cir. 2019) (alteration in original) (quoting *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 752 (3d Cir. 2019)). This appeal deals primarily with the first prong of that inquiry.

The Supreme Court has long held that public employees do not surrender their First Amendment rights by working for the government, even though they necessarily "accept certain limitations on [their] freedom" when they enter government service. *Garcetti v. Ceballos*, 547 U.S. 410, 418-19 (2006); *compare Baldassare v. New Jersey*,

---

She does not, however, appeal the District Court's dismissal of those claims.

[8] The District Court had subject matter jurisdiction under 28 U.S.C. § 1331. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291. We exercise plenary review of a district court's grant of summary judgment. *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 192 (3d Cir. 2015). "To warrant summary judgment, the movant must show that, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* (internal quotation marks omitted.)

250 F.3d 188, 194 (3d Cir. 2001) (citing *Rankin v. McPherson*, 483 U.S. 378, 383-84 (1987)) ("A public employee has a constitutional right to speak on matters of public concern without fear of retaliation."), *with Garcetti*, 547 U.S. at 418 ("Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services.").

The challenge, of course, is to "balance … the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). A public employee's speech is protected if: (1) the employee spoke as a citizen; (2) the statement involved a matter of public concern; and (3) the government employer did not have "an adequate justification for treating the employee differently from any other member of the general public based on its needs as an employer." *Baloga*, 927 F.3d at 753 (internal quotation marks omitted). "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421. Whether Dennison acted "pursuant to [her] official duties" is the crux of this claim.[9]

---

[9] "The inquiry into the protected status of speech is one of law, not fact." *Connick v. Myers*, 461 U.S. 138, 148 n.7 (1983). "Whether a particular incident of speech is made within a particular plaintiff's job duties is a mixed question of fact and law." *Flora v. Cnty. of Luzerne*, 776 F.3d 169, 175 (3d Cir. 2015) (quoting *Dougherty v. Sch. Dist. of*

The District Court rejected Dennison's First Amendment retaliation claim by holding that her conduct was not protected speech. Dennison decided to implement a virtual check-out process in her duties as Director of Residence Life, specifically out of concern for protecting her staff who were to assist with the required exodus of on-campus residents. So the Court concluded that what she said and did with respect to that decision was said and done as a University employee, not as a public citizen, even though the COVID-19 pandemic was clearly a matter of public concern. We agree. To the extent her conduct and statements were speech, they were all in her role as Director of Residence Life and were about residence life.

Dennison's decision could *only* have been made by a University employee in her position (or one similar), not by a private citizen exercising her constitutional rights to speak out about the pandemic. *See De Ritis v. McGarrigle*, 861 F.3d 444, 454 (3d Cir. 2017) ("[A]n employee does not speak as a citizen if the mode and manner of his speech were possible only as an ordinary corollary to his position as a government employee[.]"). Or, put another way, "a public employee speaks pursuant to employment responsibilities … [when] there is no relevant analogue to speech by citizens who are not government employees." *Garcetti*, 547 U.S. at 424. For instance, a parent of one of the students who disagreed with the University's policy to maintain in-person checkout

---

*Phila.*, 772 F.3d 979, 988 (3d Cir. 2014)). "[T]he scope and content of a plaintiff's job responsibilities is a question of fact, but the ultimate constitutional significance … is a question of law." *Id*.

11

during a pandemic would have no power to impose a virtual checkout system, applying to all student residents and various University staff, as Dennison did.

Dennison nevertheless argues that any speech "*related* to the individual's job duties but … not required as part of the job … [is protected] speech … not within the scope of the individual's duties." *Myers v. City of Wilkes-Barre*, 448 F. Supp. 3d 400, 412 (M.D. Pa. 2020) (emphasis added).  But the cases she cites for support are inapt and distinguishable.[10]  They present scenarios in which a public employee engaged in protected speech adjacent to his or her official duties of public employment, but not pursuant to them.  Dennison's conduct and statements, while related to a matter of public concern, were not just adjacent to her official duties; they were at the heart of her duties.  Nothing in the record supports the notion that Dennison acted in her role as a private citizen.

Therefore, the District Court did not err in granting summary judgment against Dennison on her First Amendment retaliation claim.

---

[10] In one, a police officer spoke out as a union official regarding misconduct in police management.  *Myers*, 448 F. Supp. 3d at 408.  In another, we reversed a district court's determination that a Director of Human Resources' firing for complaining about being the victim of an illegal recording was unprotected speech because "nowhere in her job duties was she instructed to report crimes" and the common ethical requirement for employees to report wrongdoing was not sufficient to bring such reporting into the realm of an HR Director's official duties.  *Javitz*, 940 F.3d at 866.  And in another we affirmed that a School District Business Officer's conduct of complaining to a newspaper that the superintendent had steered a contract to a non-qualified firm was protected speech outside the scope of his official duties even though he gained the relevant knowledge because of his official duties.  *Dougherty*, 772 F.3d at 990 (citing *Lane v. Franks*, 573 U.S. 228, 240 (2014)).

12

## B.     The Sex Discrimination Claims

Title VII prohibits employers from discriminating against employees on the basis of "race, color, religion, sex, or national origin[.]"  42 U.S.C. § 2000e-2(a)(1).  Title IX prohibits discrimination "on the basis of sex" in any federally funded education program or activity.  20 U.S.C. § 1681(a).  Sex discrimination claims are analyzed under the *McDonnell Douglas* three-step burden-shifting framework.[11]  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).  Dennison must establish a prima facie case of sex discrimination.  *Id.* at 802.  If she succeeds, the burden of production shifts to the defendant-appellees to advance a legitimate, non-discriminatory reason for their actions. *Id.*  If they advance such a position, the burden shifts back to Dennison to prove that the nondiscriminatory explanation is merely a pretext for discrimination.  *Id.* at 804.

We assume without deciding that Dennison has established a prima facie case of discrimination.  The second step under the *McDonnell Douglas* framework requires the defendant-employer to carry the "relatively light burden" to produce "evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision."  *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).  The employer "need not prove that the tendered reason *actually* motivated its

---

[11] *McDonnell Douglas* was a Title VII case, and we follow the Supreme Court's lead in turning to Title VII, as "the paradigmatic anti-discrimination law[,]" *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 616 & n.1 (1999) (Thomas, J., dissenting), to apply the law in Title IX cases.  *See Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 75 (1992) (relying on *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986), a Title VII case, in determining discrimination under Title IX).

13

behavior," since the ultimate burden is on the plaintiff to prove intentional discrimination. *Id.* Once the defendant employer meets its burden, which, as we shall explain, the defendant-appellants here have done, the plaintiff must prove by a preponderance of the evidence that the articulated reason for the adverse employment action was merely pretextual. *Id.*

To defeat summary judgment, then, Dennison must meet her "difficult burden" to "either (i) discredit[] the proffered reasons, either circumstantially or directly, or (ii) adduc[e] evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Id.* at 764-65 (emphasis removed). We have explained that that is done by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'" *Id.* at 765 (alteration in original) (emphasis removed) (citations omitted).

First, concerning her alleged "demotion" from Executive Director over Housing, Residential Living, & Dining, to Director of Residence Life, Segar testified that he launched those changes because "it just made more sense to have" a streamlined, "flatter organization" and have Baroni – who was Director of Housing and Dining at the time – report to him directly rather than indirectly through Dennison. (Opening Br. at 6-7; J.A. at 827.) Dennison advances no relevant response, alleging, as the District Court emphasized, only general arguments that male employees were treated more favorably

14

than she was.[12] Her sex discrimination arguments suffer from a further fatal flaw: her responsibilities were given to another woman. To succeed on a sex discrimination claim under Title VII or Title IX, a plaintiff must have suffered an adverse employment action based on her sex. Thus, Dennison has neither discredited Segar's proffered legitimate reasons for demoting her,[13] nor adduced evidence to show that it was more likely than not that she was demoted because she is a woman.

The same holds true for her claim of sex discrimination in her later termination. Segar first offered another woman Dennison's job, and, when that woman did not accept it, the responsibilities were given to Baroni. On these facts, no reasonable factfinder could find sex discrimination was the motivation for the employment actions about which Dennison complains. Thus, the District Court did not err in granting summary judgment on the Title VII and Title IX sex discrimination claims.

---

[12] Dennison alleges that her male predecessor was given access to the University's budget office and that she was not, that her male colleagues received more administrative support and guidance than she did, and that a male colleague was not disciplined when he violated confidentiality rules. None of her assertions relate to the demotion itself.

[13] The defendant-appellees contest that the reassignment was a demotion since no changes were made to her work hours, compensation, or benefits; it was, they say, just a title and reporting structure change. The District Court agreed and held that Dennison had "not presented sufficient evidence to demonstrate that she suffered an adverse employment action[.]" (J.A. at 23.) We call it a demotion here only because, for purposes of our disposition today, we are assuming without deciding that she suffered an adverse employment action.

## C.    The Age Discrimination Claims[14]

Dennison's age discrimination claim for her termination has somewhat better support but is still untenable.  Again, she has not shown that the articulated reasons for her demotion were mere pretext for discrimination.  Segar testified that efficiency concerns drove the decision to demote Dennison, and her response is that the University provided different, conflicting reasons to the Equal Employment Opportunity Commission – that Segar "had no confidence in [Dennison]'s leadership" and that she "lacked knowledge of the complexities of the University's dining operations and her performance directing those operations was weak."  (App. at 534.)**;** She argues that the University's post hoc excuses are pretextual and ought not be believed, given her "annual positive performance evaluations, annual merit raises, and glowing testimony from long-time supervisors."  (Opening Br. at 8.)  Even if there were inconsistent reasons given,[15] however, Dennison has still provided no answer to the claim that the restructuring occurred for efficiency reasons.  *See Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 370 (3d Cir. 2008) ("[T]o avoid summary judgment, the plaintiff's evidence rebutting the

---

[14] We again use the familiar Title VII *McDonnell Douglas* framework for analyzing claims under ADEA.  *See Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) ("[I]nterpretation of Title VII … applies with equal force in the context of age discrimination, for the substantive provisions of the ADEA 'were derived *in haec verba* from Title VII.'") (quoting *Lorillard v. Pons*, 434 U.S. 575, 584 (1978)).

[15] Dennison's assertion that the Segar and the University's reasons were in conflict is questionable.  Segar testified that he shared with Dennison "some of [his] concerns" about his "inability to get information from her.  (App. at 830.)  He also explained that he "was surprised" that some of the information he requested from Dennison was information that she "did not know[.]"  (App. at 831.)

employer's proffered legitimate reasons must allow a fact-finder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action[.]") (emphasis added).

It is true that Baroni, who eventually took over Dennison's duties, is 17 years younger than Dennison. And, upon firing Dennison, the University first offered her job to someone 14 years younger than she is. A member of President Driscoll's cabinet admitted that the phrase "dead wood" was used in meetings to refer to high-level managers who weren't "carrying their weight" and could be discharged.[16] (J.A. at 903, 908-09.) The same phrase was used in the context of Driscoll's direction to present names of employees to terminate during the COVID-19 shutdown period. The two employees fired during that period were Dennison (aged 53 years) and Woolslayer (also aged late 50s). Four or five others were considered, but the record does not show their ages.[17]

---

[16] Defendant-appellees deny using the term. But President Driscoll's Vice President of Human Resources testified extensively that the term was used during discussions about who to let go, so we accept at this stage that the term was used.

[17] Dennison also stated in a declaration that Dr. Charles Fey, who served as interim Vice President of Student Affairs for a year before Segar, "made broad joking statements about age and sex" towards Dennison, and, one time, when Dennison referred to music from the 1970s or 1980s, responded with, "Oh, you are showing your age." (J.A. at 343.) She also says that Segar's comment that "he expected more from someone with [her] years of experience" (J.A. at 414) was ageist, which "a jury could find reflects a stereotypical bias against older women like Dennison." (Opening Br. at 24.) These off-hand comments – one joking and one actually giving credit to experience not age – do not demonstrate anything about the motivation of Segar and Driscoll in demoting or firing Dennison. As for the stray remarks, we have said that "[s]tray remarks by non-

So there is some evidence detrimental to the University's position. But, taken all together and in the light most favorable to Dennison, it still does not approach a preponderance of evidence that the real reason for her firing was her age. Segar testified that he "had lost confidence in her leadership" "as it came to managing her staff in relation to what was happening with the closing of the residence halls in response to COVID-19." (App. at 845.) Notably, Dennison herself believed that she was fired for the implementing the virtual checkout process. During her deposition, Dennison testified that, on the day of her termination, she told one of her staff members she thought she was fired because of her "decision to close the desks." (App. at 405). She also testified that reviewing University leaders' depositions "le[d her] to believe that [the termination] was a direct response to [her] speech[.]" (App. at 411.) Indeed, Dennison's First Amendment retaliation claim appears to be in tension with her age discrimination claim. It is hard to persuasively argue that the University fired her because of her age, while, at the same time, saying that it fired her because of her speech.[18] The District Court was correct in observing that the weight of the evidence indicates University leaders terminated

decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision." *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992).

[18] Her argument that age was the real factor behind her firing is undermined by the way she had been treated previously too. Dennison admitted in deposition testimony that she "was encouraged to apply for the vice president of student affairs position," the position that Segar eventually took, but she did not apply because she "did not feel prepared[.]" (J.A. at 383.)

Dennison because they lost confidence in her leadership after she implemented the virtual check-out process.[19]

We are not unsympathetic to Dennison. Her firing was abrupt and unexpected, but it was not unlawful. "The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason [was] discrimination." *Atkinson v. LaFayette Coll.*, 460 F.3d 447, 454 (3d Cir. 2006) (cleaned up) (quoting *Keller v. Orix Credit All., Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997)). Dennison served at the pleasure of the President, and the President lost confidence in her. We review only if a genuine factual dispute remains as to whether discriminatory animus motivated an employer. As described above, none does.

## III.   CONCLUSION

Accordingly, we will affirm the District Court's grant of summary judgment for the defendant-appellees.

---

[19] Accepting as true Dennison's assertion that Driscoll fired her based on Segar's false claim that she had, without consulting Segar, implemented the virtual checkout system does not help her claim. First, Segar's false statement provides an age-neutral reason that she was fired. Additionally, approved or not, the virtual checkout process was Dennison's idea and, therefore, does not contradict Segar's testimony that he recommended Dennison be fired because he "generally was concerned about her capacity to lead … and [to] carry out the functions of her responsibilities and leading staff." (App. at 845.)