PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

Nos. 17-2228, 17-2229

———————

COREY BLAND; VIRGINIA BLAND

v.

CITY OF NEWARK; CITY OF NEWARK POLICE
DEPARTMENT; NEW JERSEY DIVISION OF STATE
POLICE; STATE OF NEW JERSEY; SERGEANT JAMES
THOMPSON; SERGEANT BRIAN MURPHY; TROOPER
II THOMAS ESPINOZA; TROOPER II WILLIAM LEGG;
TROOPER MIGUEL HOLGUIN; TROOPER ANTHONY
SARDANOPOLI; TROOPER JOHN OLIVEIRA;
TROOPER STEPHEN RIEFLER; DETECTIVE THOMAS
DEL MAURO; DETECTIVE BRIAN COSTA; DETECTIVE
DAVID MARTINEZ; SERGEANT THOMAS ROE;
OFFICER DANNY COSTA; JOHN DOES (1–100); ABC
ENTITIES (1–100), A Series of Fictitious Names,

New Jersey State Police, State of New Jersey, Anthony
Sardanopoli, James Thompson, Brian Murphy, Thomas
Espinoza, William Legg, Miguel Holguin,
John Oliveira and Stephen Riefler
Appellants in No. 17-2228

Thomas Delmauro, David Martinez and Ruben Torres
Appellants in No. 17-2229

——————

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 2-13-cv-02985)
District Judge: Honorable Katharine S. Hayden

——————

Argued March 22, 2018
Before: SMITH, *Chief Judge*, HARDIMAN, and BIBAS,
*Circuit Judges*.

(Filed: August 15, 2018)

Pamela L. Brause
Peter Ventrice [Argued]
Brause Brause & Ventrice
276 Main Street, P.O. Box 232
Metuchen, NJ 08840

Lucas E. Phillips, Jr. [Argued]
134 Evergreen Place, Suite 301
P.O. Box 2487
East Orange, NJ 07019
    *Attorneys for Appellees*

Michael C. Walters [Argued]
Office of Attorney General of New Jersey
Division of Law
Richard J. Hughes Justice Complex
25 Market Street, P.O. Box 112
Trenton, NJ 08625
        *Attorney for All Appellants*

Gary S. Lipshutz [Argued]
City of Newark Department of Law
920 Broad Street, Room 316
Newark, NJ 07102
        *Attorney for Appellants Thomas Del Mauro, David*
        *Martinez, and Ruben Torres*

Michael H. Freeman
Greenberg Dauber Epstein & Tucker
One Gateway Center, Suite 600
Newark, NJ 07102

Matthew J. Lynch
Office of Attorney General of New Jersey
Division of Law
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625
        *Attorneys for Appellants State of New Jersey, New*
        *Jersey State Police, James Thompson, Brian Murphy,*
        *Thomas Espinoza, William Legg, Miguel Holguin,*
        *Anthony Sardanopoli, John Oliveira and Stephen*
        *Riefler*

_____

OPINION OF THE COURT

_____

HARDIMAN, *Circuit Judge*.

This interlocutory appeal was filed by several law enforcement officers who were involved to varying degrees in a prolonged pursuit of a fleeing motorist, Corey Bland. The pursuit involved the use of lethal force against Bland, who sustained severe injuries after he was shot between 16 and 18 times. The question presented is whether the District Court committed legal error when it denied the officers summary judgment on qualified immunity grounds. Because the officers' conduct was within the bounds of the Supreme Court's relevant decisions regarding the use of lethal force, we will reverse.

I

A. Initial Pursuit

In the early evening of December 26, 2011, Newark Police received a report that a black Audi bearing Pennsylvania license plate number PZK821C had been carjacked at gunpoint. Approximately three hours later, New Jersey State Troopers James Thompson and Brian Murphy spotted the carjacked vehicle in Newark. Appellee Corey Bland was behind the wheel. The troopers activated their police lights, but Bland failed to stop. Instead, he accelerated and began to drive recklessly, running red lights and shutting off his headlights as he went. The troopers lost sight of the Audi, but an officer from the Summit Police Department began following it shortly

4

thereafter. Bland nearly struck that officer's vehicle and collided with an embankment, but he continued driving. He reached speeds exceeding 100 miles per hour, weaving in and out of light traffic.

State Trooper John Oliveira joined the chase in his marked police car after receiving reports that units from the State Police and Summit Police Departments were pursuing a carjacked vehicle. State Trooper Miguel Holguin,[1] driving an unmarked Chrysler 300 accompanied by State Troopers Anthony Sardanopoli and Stephen Riefler, got involved after hearing a radio broadcast by Thompson and Murphy containing details about the carjacked vehicle. Bland continued to drive recklessly, frequently changing lanes, disregarding traffic lights, turning his lights off, accelerating to more than 80 miles an hour in an area with a 25-mile-per-hour speed limit, and driving over a curb in an empty parking lot, which caused the Audi to begin to smoke. Despite all this, the Audi was not disabled, and Bland continued to evade police.

B. Lincoln Park Events

Eventually, Bland began driving the wrong way down Lincoln Park, a one-way street. While doing so, he collided both with Thompson and Murphy in their marked state police car and an occupied Newark Police vehicle. When Bland hit the Newark police car, he was travelling approximately 25 to 35 miles per hour, and the impact caused the police car to strike an unoccupied parked car. As a result, the Audi, the police car, and the unoccupied car became entangled. State Trooper

---

[1] Discrepancies exist about the spelling of this trooper's name. We adopt the spelling provided by the trooper in his deposition.

5

Thomas Espinoza, who had received a radio transmission about an ongoing pursuit involving a vehicle carjacked at gunpoint, arrived on the scene shortly after these collisions.

Numerous officers surrounded the Audi, including Murphy, Thompson, Oliveira, Sardanopoli, Espinoza, and State Trooper William Legg.[2] Many of the officers ordered Bland to surrender, and one officer attempted to break the Audi's window by striking it. During this encounter, the six state troopers fired a total of 28 shots, none of which hit Bland. Newark Police Officer Thomas Del Mauro was present at Lincoln Park, but he did not discharge his weapon.

There is no evidence in the record that Bland attempted to surrender at this time. Instead, he revved the Audi's engine, spun its tires, and tried to get the vehicle to accelerate. Bland ultimately freed the Audi from the Newark police car by reversing and striking the now-unoccupied state police car a second time.[3] He then drove over a curb and through a public park.

Upon exiting the park, Bland continued to speed through Newark with his lights off, at times on roads populated with vehicular and pedestrian traffic. Officers and state

---

[2] Bland does not identify any actions taken by Riefler or Holguin at Lincoln Park.

[3] Both the Newark officers and the state troopers contend that Bland drove aggressively at the officers as he attempted to flee, but Bland disputes this characterization. That dispute is immaterial, however, because all parties agree that officers were standing less than 10 feet from the Audi as Bland extricated it from the two vehicles.

troopers continued to pursue Bland, but Thompson and Murphy were no longer involved because their vehicle was disabled when it was struck by the Audi at Lincoln Park. During this portion of the chase, a state police car struck an occupied civilian vehicle. Bland eventually drove to the intersection of 18th Avenue and Livingston Street, where the most vigorously disputed series of events took place.

## C. The Terminus of the Chase

At the intersection of 18th and Livingston, the unmarked Chrysler 300 driven by Holguin allegedly rammed the Audi, sending the Audi into scaffolding that surrounded a school. State Troopers Holguin, Sardanopoli, and Riefler exited the Chrysler 300 and moved toward the Audi, which remained entangled in the scaffolding. Holguin approached the driver's side with Riefler standing behind him, while Sardanopoli moved to the Audi's passenger side.

All three troopers began firing their weapons at the Audi. Holguin and Riefler testified that they initially discharged their weapons because Bland refused to comply with their orders to show his hands and to stop moving and because he repeatedly threatened to kill the officers. Sardanopoli stated that he fired his weapon after he saw Holguin firing. Legg—also on the scene—asserted that he fired because he could see Bland moving around in the Audi as Holguin and Riefler discharged their weapons. Bland, for his part, denied that the troopers shouted any verbal commands or that he made evasive movements, but he conceded that nothing in the record contradicts the officers' allegations that he threatened to kill them.

7

After the first volley of shots, Riefler approached the driver's side of the Audi, whereupon Riefler testified that Bland attempted to climb through the window while again threatening to kill him. In response, Riefler fired his weapon again. Espinoza also discharged his weapon, as did Newark Officers Del Mauro, Reuben Torres, and David Martinez, who had heard about the carjacking at roll call earlier that evening. The Newark officers stated that they fired their weapons because they saw the Audi moving or heard it revving, indicating that it was still capable of flight. Bland disputed this assertion, arguing instead that the Audi became inoperable once it crashed into the scaffolding. Oliveira, though present, did not discharge his weapon at the terminus.

The shooting finally ceased once Riefler observed Bland slumped over, and a Newark sergeant called for the officers to hold their fire. Bland was shot between 16 and 18 times, including in the face, chest, and abdomen. He suffered numerous injuries, including a traumatic brain injury, respiratory failure, vision loss, and multiple facial fractures. No gun was recovered from the scene, and no officer observed Bland with a weapon during the course of the pursuit.

II

Bland and his wife Virginia filed a complaint in the Superior Court of New Jersey Law Division alleging (among other things) that Defendants violated Bland's Fourth Amendment rights. *See* 42 U.S.C. § 1983; N.J. Stat. Ann. § 10:6-2(c). Defendants removed the case to federal court and sought summary judgment, claiming qualified immunity.

After oral argument, the District Court concluded that it was "not in a position to grant or deny qualified immunity."

App. 78. Instead, it held that a jury must first decide two issues of material fact: (1) whether the Audi's engine was revving (and thus whether the car was capable of moving) after it crashed into the scaffolding; and (2) whether the officers could see Bland's movements inside the vehicle. The District Court opined that the Supreme Court's decision in *Plumhoff v. Rickard*, 134 S. Ct. 2012 (2014), issued three years *after* the car chase, may decide the "central" question of "whether or not Corey Bland was an active threat to the officers at the terminus so as to justify their actions in using deadly force to end that risk." App. 73. Accordingly, it denied Defendants' motion, including with respect to the three officers who were neither present nor discharged their weapons at the terminus of the chase. Defendants moved for a stay of trial, which the District Court denied. We entered an order staying the district court proceedings pending the resolution of this timely interlocutory appeal.

III

A

The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1367. We have jurisdiction under 28 U.S.C. § 1291 pursuant to the collateral order doctrine. *Dougherty v. Sch. Dist. of Phila.*, 772 F.3d 979, 986 (3d Cir. 2014) (citation omitted). Our jurisdiction lies "only to the extent that the order turns on an issue of law." *Id.* (internal quotation marks, citation, and alteration omitted). We "possess jurisdiction to review whether the set of facts identified by the district court is sufficient to establish a violation of a clearly established constitutional right," but "we lack jurisdiction to consider whether the district court correctly identified the set of facts

9

that the summary judgment record is sufficient to prove."[4] *Id.* (quoting *Ziccardi v. City of Philadelphia*, 288 F.3d 57, 61 (3d Cir. 2002)). "To the extent we have jurisdiction, this Court exercises plenary review." *Id.*

Summary judgment is proper only when the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "affect[s] the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine dispute of material fact exists, we view the underlying facts and draw all reasonable inferences in favor of the party opposing the motion. *Dougherty*, 772 F.3d at 986.

B

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). In resolving questions of qualified immunity, "courts engage in a two-pronged inquiry:

---

[4] The Newark officers argue that the District Court erred by considering Bland's expert testimony, which purported to establish that the Audi was incapable of moving once it crashed into the scaffolding. We do not have jurisdiction to review this ruling. *See Blaylock v. City of Philadelphia*, 504 F.3d 405, 409 (3d Cir. 2007) (noting that, in appeals from denials of qualified immunity, "we lack jurisdiction to review questions of 'evidence sufficiency'" and must instead confine ourselves to "pure questions of law").

(1) whether the plaintiff sufficiently alleged the violation of a constitutional right, and (2) whether the right was 'clearly established' at the time of the official's conduct." *L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235, 241 (3d Cir. 2016). We may tackle these steps "in the order we deem most appropriate for the particular case before us." *Santini v. Fuentes*, 795 F.3d 410, 418 (3d Cir. 2015) (citation omitted).

Just two terms ago, the Supreme Court reiterated the "longstanding principle that clearly established law should not be defined at a high level of generality," but must instead "be particularized to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam) (internal quotation marks omitted); *see also L.R.*, 836 F.3d at 248. Moreover, at the time the action is taken, the "legal principle [must] clearly prohibit the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (internal quotation marks and citation omitted). Thus, "qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix*, 136 S. Ct. at 308 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

C

The District Court focused its analysis on the events that occurred at the terminus of the reckless flight that ensued after Bland failed to comply with the traffic stop initiated by the New Jersey State Police. We begin by discussing the deadly force used by six of the state troopers at Lincoln Park, and we conclude that they are all entitled to qualified immunity.

11

The Supreme Court has consistently held that officers either did not violate the Fourth Amendment or were entitled to qualified immunity when they used deadly force during car chases similar to the one at issue here. In *Brosseau v. Haugen*, 543 U.S. 194 (2004) (per curiam), the Court held that an officer was entitled to qualified immunity after she shot "a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area [were] at risk from that flight." *Id.* at 200. In *Scott v. Harris*, 550 U.S. 372 (2007), the Court concluded that an officer did not violate the Fourth Amendment when he "terminate[d] the car chase by ramming his bumper" into the car of a fugitive whose reckless driving "posed an actual and imminent threat to the lives of any pedestrians who might have been present, to other civilian motorists, and to the officers involved in the chase." *Id.* at 381, 384. This was so even though the officer ran the motorist off the road instead of employing the standard "PIT maneuver"[5] to get the fleeing vehicle to stop, and this decision caused the vehicle to run down an embankment and overturn, rendering the plaintiff a quadriplegic. *Id.* at 375.

In *Plumhoff v. Rickard*, 134 S. Ct. 2012 (2014), decided after the events giving rise to this suit, the Court held that officers did not violate the Fourth Amendment and alternatively were entitled to qualified immunity when they fatally shot a fugitive whom the officers reasonably believed was "intent on resuming" a chase that "pose[d] a deadly threat for others on the road." *Id.* at 2022. A year later, in *Mullenix v.*

---

[5] In a Pursuit Intervention Technique maneuver, the pursuing vehicle applies pressure to the rear of the fleeing vehicle, causing the fleeing vehicle to turn abruptly and come to a stop.

12

*Luna*, 136 S. Ct. 305 (2015), the Court concluded that an officer who shot and killed a motorist during a high-speed pursuit in which the fugitive threatened to kill police officers was entitled to qualified immunity, even though the officer's decision to shoot defied his supervisor's orders. *Id.* at 306–07, 312.

Like the cases just mentioned, Bland's behavior threatened the safety of the officers, as well as the public at large. Before shots were fired at Lincoln Park, Bland drove at high speeds, disregarded traffic signals, drove the wrong way down a one-way street, collided with two occupied police vehicles, and failed to comply with orders to surrender. As the gunfire erupted, he repeatedly attempted to flee from police and state troopers, including by trying to drive with officers standing in close proximity to the Audi. And he engaged in all of this behavior in a vehicle that had been reportedly taken at gunpoint a few hours earlier. Bland does not direct us to any caselaw indicating that, especially in light of the precedent just discussed, "only someone plainly incompetent or who knowingly violates the law would have perceived a sufficient threat and acted as [the state troopers] did" in this situation. *Mullenix*, 136 S. Ct. at 310 (internal quotation marks and alteration omitted); *see also Fields v. City of Philadelphia*, 862 F.3d 353, 361 (3d Cir. 2017) (noting that clearly established rights are derived either from binding Supreme Court and Third Circuit precedent or from a "robust consensus of cases of persuasive authority in the Courts of Appeals" (citation omitted)). Given the troopers' reasonable belief that Bland was armed, and the mortal threat that his conduct posed to those around him, the troopers who discharged their weapons at Lincoln Park did not violate Bland's clearly established constitutional rights. And because Thompson, Murphy, and

13

Oliveira fired their weapons only at this location, they are plainly entitled to qualified immunity.

D

The events at the terminus of the car chase present a more complicated picture, but we reach the same conclusion because Bland identifies no caselaw indicating that the officers violated clearly established law extant in 2011. *See Anderson v. Creighton*, 483 U.S. 635, 639 (1987). He instead states in conclusory fashion that "every . . . reasonable member of law enforcement should be aware that [the officers'] conduct would constitute excessive force." Bland Br. 36. In support, Bland argues that the officers were not in a position to see whether he made threatening movements inside the vehicle, and that the Audi's impact with the scaffolding rendered it inoperable, bringing the car chase to an end.[6] As a result, Bland contends that *Brosseau* and *Scott* no longer control, and we should instead look to *Tennessee v. Garner* for guidance. In

_____

[6] After the parties submitted their summary judgment papers, Bland received a report from an automotive expert concerning whether the Audi could have moved after it collided with the scaffolding. The report contained pictures taken after the incident, including one that purportedly showed the driver's side tinted window in one piece on the ground. At oral argument, Bland contended that this photograph demonstrated that the window was up during the final moments of the chase, meaning that the officers could neither have seen what Bland was doing inside the Audi nor heard his death threats. We need not decide whether the District Court properly considered this evidence because, even assuming that its decision to do so was correct, Bland has failed to show that the officers violated clearly established law.

14

*Garner*, the Supreme Court held that "if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Tennessee v. Garner*, 471 U.S. 1, 11–12 (1985). Applying that standard, the Court concluded that an officer violated the Fourth Amendment by shooting an "unarmed, nondangerous" suspect in the back of the head as he attempted to flee the scene of a burglary. *Id.* at 11.

Bland's reliance on *Garner* is misplaced. The Supreme Court has noted that *Garner* "lay[s] out excessive-force principles at only a general level" and "do[es] not by [itself] create clearly established law outside an obvious case." *White*, 137 S. Ct. at 552 (internal quotation marks omitted); *see also Scott*, 550 U.S. at 382 (noting that "*Garner* did not establish a magical on/off switch that triggers rigid preconditions whenever an officer's actions constitute 'deadly force'").

The officers here confronted a scenario quite different from the one presented in *Garner*, where the officer pursued and shot a nondangerous suspect in the back of the head, even though the officer was "reasonably sure" the suspect was unarmed. 471 U.S. at 3–4; *see also Brosseau*, 543 U.S. at 201 (noting that analysis of qualified immunity "depends very much on the facts of each case"). This becomes especially clear once we consider the officers' actions "in light of the specific context of the case," as we are required to do. *Fields*, 862 F.3d at 361. The state troopers and Officer Del Mauro—all of whom were present at Lincoln Park—continued to pursue a fugitive who once again disobeyed traffic lights, drove at excessive speeds, and put pedestrians and motorists at great risk. Under

15

Bland's version of events, at least one innocent civilian suffered harm by his flight when a state police car struck an occupied vehicle during the final leg of the pursuit. *See Scott*, 550 U.S. at 379–80 (noting that the police were "forced to engage in the same hazardous maneuvers just to keep up" with the plaintiff). After the crash, Bland threatened to kill the officers, and the record provides no evidence that he attempted to surrender at any time. Though the Audi remained pinned against the scaffolding, the officers had previously seen Bland successfully free the car and continue to flee after the crash at Lincoln Park. And although the officers did not see a weapon, the police reports of an armed carjacking gave them reason to believe Bland was armed. *See Pearson*, 555 U.S. at 244 (noting that qualified immunity "turns on the objective legal reasonableness of the action" (internal quotation marks and citation omitted)). This was the situation the officers confronted at the terminus of the chase when they discharged their weapons. Bland identifies no cases with similar facts that, in 2011, would have "put every reasonable offic[er] on notice" that using deadly force in such a situation violated clearly established constitutional rights. *Fields*, 862 F.3d at 361 (internal quotation marks omitted). Therefore, accepting (as we must) the truth of Bland's assertions regarding the Audi's immobility and the officers' ability to see Bland's hands, our conclusion remains the same: the actions taken by the State Troopers and Officer Del Mauro are protected by qualified immunity.

But what about Newark Officers Torres and Martinez, who, according to Bland, "arrived on the scene[ and] joined in the shooting without knowing whether Mr. Bland was firing at them, and without ever first observing Mr. Bland to be in possession of any firearm"? Bland Br. 5. The Newark officers

contend that video footage refutes this allegation, but we need not resolve that dispute.[7] Here again, Bland has presented no caselaw demonstrating that the officers, who reasonably believed that Bland was armed, violated a clearly established right by joining in the chaotic scene and discharging their weapons.

A recent Supreme Court decision demonstrates that Torres's and Martinez's actions did not violate clearly established rights. In *White v. Pauly*, the Court granted qualified immunity to an officer who arrived late to an armed confrontation between multiple officers and individuals. 137 S. Ct. at 549, 551. After seeing one of the civilians fire shots, the defendant officer, without giving a warning, shot and killed another individual who pointed a weapon at the officers surrounding the house. *Id.* at 550. The plaintiffs argued that the other officers had not adequately alerted the occupants to the

---

[7] Though we need not look to the video for guidance, we take this opportunity to remind district courts of their obligation to do so when necessary to identify disputed issues of material fact. At oral argument, the Newark officers requested that the District Court consider video footage they proffered to counter Bland's version of events. The Court declined this invitation, stating that it did not think it was "particularly smart" to "hav[e] judges review individual tapes and say, hey, I'm satisfied." App. 27. Notwithstanding the District Court's independent assessment of the wisdom of this approach, the Supreme Court has instructed courts to consider video evidence in the record and to "view[] the facts in the light depicted by the videotape," especially when it "blatantly contradict[s]" the nonmovant's narrative. *Scott*, 550 U.S. at 380–81.

17

fact that they were officers, and that White, although late to the scene, should have been aware that "corrective action was necessary." *Id.* at 552. In reversing the denial of qualified immunity, the Court stated that "[c]learly established federal law does not prohibit a reasonable officer who arrives late to an ongoing police action in circumstances like this from assuming that proper procedures . . . have already been followed," and that "[n]o settled Fourth Amendment principle requires that officer to second-guess the earlier steps already taken by his or her fellow officers." *Id.* So too here. In the absence of any controlling law to the contrary, Newark Officers Martinez and Torres likewise are entitled to qualified immunity.[8]

IV

Because Defendants did not violate any of Bland's clearly established constitutional rights, we will reverse the order of the District Court so summary judgment may be entered for Defendants.

---

[8] Because Defendants are entitled to qualified immunity, we need not reach the underlying Fourth Amendment questions. *Pearson*, 555 U.S. at 236. Nothing in this opinion should be read to suggest that law enforcement officers violate the Fourth Amendment where, as here, they employ lethal force to neutralize a carjacking suspect reasonably perceived to be armed, dangerous, and unwilling to peacefully surrender.