**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

18-3004

_____

JAMILA RUSSELL; L.T.

v.

SUPERIOR COURT MARSHAL CHRISTOPHER RICHARDSON, In his individual
and official capacity; GOVERNMENT OF THE VIRGIN ISLANDS; SUPERIOR
COURT OF THE VIRGIN ISLANDS,

Appellants

_____

On Appeal from the District Court
for the Virgin Islands
(D.V.I. No. 1-15-cv-00049)
Honorable Anne E. Thompson, U.S. District Judge

_____

Argued: May 15, 2019

Before: KRAUSE, ROTH, and FISHER, *Circuit Judges*

(Opinion filed: July 25, 2019)

_____

**OPINION**[*]

_____

_____

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not
constitute binding precedent.

Gordon C. Rhea
Richardson Patrick Westbrook & Brickman
1037 Chuck Dawley Boulevard
Building A
Mount Pleasant, SC 29464

Yvette D. Ross-Edwards, I [ARGUED]
Law Office of Yvette Ross Edwards
429 King Street
Suite 8
Frederiksted, VI 00840
        *Counsel for Appellees Jamila Russell and L.T.*

Paul L. Gimenez
Superior Court of the Virgin Islands
Office of General Counsel
P.O. Box 70
St. Thomas, VI 00804

Dana M. Hrelic [ARGUED]
Horton Dowd Bartschi & Levesque
90 Gillett Street
Hartford, CT 06105

Erika M. Scott
Office of Attorney General of Virgin Islands
6040 Castle Coakley
Christiansted, VI 00820
        *Counsel for Appellant Superior Court Marshal Christopher Richardson*

Ian S.A. Clement
Su-Layne U. Walker
Office of Attorney General of Virgin Islands
Department of Justice
34-38 Kronprindsens Gade
GERS Complex, 2nd Floor
St. Thomas, VI 00802

Paul L. Gimenez
Superior Court of the Virgin Islands
Office of General Counsel
P.O. Box 70
St. Thomas, VI 00804

2

Erika M. Scott
Office of Attorney General of Virgin Islands
6040 Castle Coakley
Christiansted, VI 00820
    *Counsel for Appellant Government of the Virgin Islands*

Pamela L. Colon
Suite 3
2155 King Cross Street
Christiansted, VI 00820

Paul L. Gimenez
Superior Court of the Virgin Islands
Office of General Counsel
P.O. Box 70
St. Thomas, VI 00804

Dana M. Hrelic
Horton Dowd Bartschi & Levesque
90 Gillett Street
Hartford, CT 06105
    *Counsel for Appellant Superior Court of the Virgin Islands*


KRAUSE, *Circuit Judge*.

Jamila Russell and L.T. sued Christopher Richardson, the Superior Court of the Virgin Islands, and the Government of the Virgin Islands (the "VI Defendants"), alleging use of excessive force in connection with the tragic shooting of L.T. The VI Defendants moved for summary judgment on the basis of various forms of immunity, and the District Court denied their motion. The undisputed facts that were developed through discovery since this case was before us at the motion-to-dismiss stage now paint a very different picture than the one we previously confronted. Because, on these facts, the right that Richardson allegedly violated was not clearly established, we will reverse.

3

## I.     Background

After L.T., a juvenile, failed to appear at a hearing ordered by the Family Division of the Virgin Islands Superior Court, a judge issued an order on June 28, 2013 to take L.T. into custody and "detain[]" him "until a review hearing date was scheduled." *Russell v. Richardson*, No. CV 15-49, 2018 WL 3849795, at *2 (D.V.I. Aug. 13, 2018). Two weeks went by without L.T. being taken into custody. On the morning of July 11, Jamila Russell, L.T.'s mother, encountered Deputy Marshal Wong at a local bakery and expressed concern about a picture that she had seen on social media of her son posing with a handgun. She also asked Wong to have the Marshals pick up L.T., who lived with Russell and was asleep at their home when she left that morning. Russell did not want to be present when the Marshals picked up her son, so she gave her house key to Wong. Wong, in turn, contacted Deputy Marshal Parris, who was the Marshal in charge of the Family Division, about the pick-up order for L.T.

Parris spoke to both Russell and Wong and learned about the photograph of L.T. posing with a firearm, obtained the key from Wong and went to the house. There, after he "made a check around the house," *Russell*, 2018 WL 3849795, at *3, he realized he "was going to need back-up," *id.* (quoting Parris Aff. at ¶ 11), and called Deputy Marshal Richardson for assistance. On the phone, Parris relayed to Richardson that L.T. was "refusing to come out" of the house, *id.*, that he "might be armed," *id.* (quoting Parris Aff. at ¶ 12), and that the information about the weapon stemmed from information Parris got from L.T.'s mother. As Richardson prepared to leave, Deputy Marshal de Chabert

4

joined him, and the two grabbed their bulletproof vests and traveled together from the Marshals' Office to L.T.'s residence.

On the way, Richardson briefed de Chabert that L.T. might be armed and that he was refusing to come out of the house. Richardson also received another call from Parris, who told Richardson that L.T. still "would not leave the [house]," *id.* at *4, and that he could hear L.T. "running around and rummaging around inside," *id.* (quoting Richardson Aff. at ¶ 7). When Richardson and de Chabert arrived, Parris briefed them once more, reiterating "the possibility that [L.T.] was armed," *id.* (quoting Parris Aff. at ¶ 15), and that L.T. was "inside running from window to window," *id.* (quoting de Chabert Dep. at 9).

Richardson took the house key from Parris, approached the residence, and began to unlock the front door of the house. With the key in his left hand and his gun in his right, Richardson opened the first of two locks on the door and signaled to de Chabert— who was positioned six feet away—that he was about to open the second lock. But before he could do so, L.T. suddenly swung open the door. According to Richardson's deposition, the "door just bust [sic] open" and it "appeared like [L.T.] was charging towards [him]." *Id.* at *5 (quoting Richardson Dep. at 24, 34). The door struck Richardson in the "upper right portion of his chest," and as a result he was "throw[n] . . . off balance" just outside the door, with L.T. immediately before him. *Id.*

Within a fraction of a second, two shots were fired, one by Richardson and one by de Chabert. According to Richardson, "less than like a millisecond," *id.* (quoting Richardson Dep. at 34), elapsed between "when the door burst open and when the shots

5

were fired," *id.* De Chabert said the same thing about the timing: "The door pushed out, hitting . . . Richardson, and it was simultaneous, the door hit, gun went off." *Id.* (quoting de Chabert Dep. at 10). Right after the shots, de Chabert saw L.T. "f[a]ll forward coming into . . . Richardson's arm, and [Richardson] placed him on the ground." *Id.* (quoting de Chabert Dep. at 10). The other officers, who were covering the backside of the house when the shots were fired, rushed to the front of the house upon hearing the shots, and L.T., who was bleeding from the neck, was treated on the scene pending the arrival of medical assistance. Neither L.T. nor Russell disputed the officers' testimony, as L.T. has no memory of the shooting and Russell was not present.

Russell, on behalf of L.T., filed a complaint against the VI Defendants, asserting common law tort claims and a claim under 42 U.S.C. § 1983 for use of excessive force. The District Court denied the VI Defendants' motion to dismiss, which was premised on, among other things, failure to comply with the Virgin Islands Tort Claims Act (VITCA) and qualified and quasi-judicial immunity. We affirmed in all relevant respects. *See Russell v. Richardson*, 905 F.3d 239, 258 (3d Cir. 2018) (*Russell I*). While that appeal was pending, the parties continued discovery, and the VI Defendants moved for summary judgment, asserting the same forms of immunity. The District Court, focusing on the first prong of the qualified immunity analysis, concluded that there were genuine disputes of material fact and denied the motion. The VI Defendants now appeal, contending that, based on the record that has developed since *Russell I*, summary judgment should have been granted.

6

## II.    Discussion[1]

The VI Defendants raise two issues on appeal.  First, they challenge the District Court's denial of qualified immunity on the claims against Richardson in his individual capacity.  Second, largely rehashing the same points we found unpersuasive in *Russell I*, they argue that Appellees failed to comply with the VITCA and that sovereign immunity thus bars their claims.  We only reach the first issue, as our conclusion that Richardson is entitled to qualified immunity obviates the need to address the second.

The qualified immunity doctrine "shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  To resolve questions of qualified immunity at summary judgment, we follow a two-prong inquiry:  (1) "we ask whether the facts—taken in the light most favorable to the nonmoving party—show that a government official violated a constitutional right"; and (2) "we ask whether that right was clearly established at the time of the official's

---

[1] The District Court had jurisdiction under 28 U.S.C. § 1331 and § 1367(a).  We have jurisdiction to review the denial of qualified immunity under the collateral order doctrine.  *Bland v. City of Newark*, 900 F.3d 77, 82 (3d Cir. 2018).  Specifically, we "possess jurisdiction to review whether the set of facts identified by the district court is sufficient to establish a violation of a clearly established constitutional right," but "we lack jurisdiction to consider whether the district court correctly identified the set of facts that the summary judgment record is sufficient to prove."  *Id.* (quoting *Dougherty v. Sch. Dist. of Phila.*, 772 F.3d 979, 986 (3d Cir. 2014)).  To the extent we have jurisdiction over the denial of qualified immunity, our standard of review is plenary.  *Id.* at 83.  We also have jurisdiction to review the denial of sovereign immunity under the collateral order doctrine, and we exercise plenary review.  *Russell I*, 905 F.3d at 246, 255.

actions." *Santini v. Fuentes*, 795 F.3d 410, 417 (3d Cir. 2015). We have discretion to address these steps "in the order we deem most appropriate for the particular case before us." *Id.* at 418. The District Court focused on the first prong, concluding that genuine disputes of fact precluded a determination of whether Richardson violated a constitutional right.

We do not disagree with the District Court that Richardson's subjective perceptions and reasons for shooting are disputed on this record. Nor are we unsympathetic to the hardship and grief that L.T. and his family have endured. But at the same time, we are mindful that in evaluating qualified immunity, we must apply an objective standard and ask "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). That requires us to first define the right "in light of the specific context of the case," *id.* at 201, and then assess, based on "the backdrop of the law at the time of the conduct," whether the officer had "fair notice" that her specific conduct violated that right, *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam). This need for "specificity is especially important in the Fourth Amendment context," *Mullenix*, 136 S. Ct. at 308, for while there need not be "a case directly on point," *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011), "police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue," *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (per curiam) (quoting *Mullenix*, 136 S. Ct. at 309).

In the excessive force context, as the Supreme Court explained in *Graham v. Connor*, the existing precedent we must consider is that addressing whether the officer's

8

actions were "'objectively reasonable' in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation[s]. . . . An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." 490 U.S. 386, 397 (1989) (citation omitted). While the Court held there and in *Tennessee v. Garner* that it was constitutionally unreasonable to "seize an unarmed, nondangerous suspect by shooting him dead," *Tennessee v. Garner*, 471 U.S. 1, 11 (1985), the Court has since clarified that a right to be free from the use of excessive force may be established at that level of generality only in an "obvious" case, *Brosseau*, 543 U.S. at 199. Outside of the "obvious" case, we must define the right in a more "particularized sense," *id.* (quoting *Saucier*, 533 U.S. at 202) (internal quotation marks omitted), and ascertain whether a "body of relevant caselaw" clearly established that right, *id.*

Here, formulating the right "in light of the specific context of th[is] case," *Saucier*, 533 U.S. at 201, the question is whether a reasonable officer in Richardson's position had fair notice that it was unlawful to use deadly force against a suspect whom the officer was credibly informed might be armed when the officer was suddenly confronted in immediate proximity by the oncoming suspect. Appellees argue that this right was clearly established under *Garner* and *Abraham v. Raso*, 183 F.3d 279 (3d Cir. 1999), but those cases involved very different factual scenarios. In *Garner,* the officer's use of force against a fleeing suspect who was "young, slight, and unarmed" was deemed unreasonable where the officer had *no reason* to believe the suspect was armed and the

9

suspect "posed [no] physical danger to . . . others." *Garner*, 471 U.S. at 20–21.  And in *Raso*, where the officer also had "no reason to believe the [suspect] was armed or dangerous," it was disputed whether the officer was, in fact, in front of the suspect's car when she fired at him and thus whether a reasonable officer in her position would have believed the suspect "posed a significant threat of death or serious physical injury to other people." 183 F.3d at 288, 293.

Here, in contrast, there is no dispute that the officer, Richardson, received credible information from his superior that the suspect might be armed and found himself suddenly and directly in front of the suspect, with events unfolding at a whip-crack pace. *Garner* and *Raso* thus shed little light on what would be expected of a reasonable officer under then-existing case law in those circumstances.  And when we look to cases that do more closely approximate the "facts and circumstances confronting" an officer in Richardson's position, *Graham*, 490 U.S. at 397, they run the gamut.

More recently, one Court of Appeals found an officer's use of deadly force unreasonable when he shot a suspect "[l]ess than a second" after instructing him to show his hands, despite "little, if any, reason to believe that [the suspect] was armed." *A.K.H. by & through Landeros v. City of Tustin*, 837 F.3d 1005, 1012 (9th Cir. 2016).  And others have found the use of deadly force unconstitutional even when the officer observed the suspect to be armed.  *See Tenorio v. Pitzer*, 802 F.3d 1160, 1165–66 (10th Cir. 2015) (holding that use of deadly force against suspect who was wielding a knife and refusing to drop it, but had made no stabbing or charging motions, was unconstitutional); *Weinmann v. McClone*, 787 F.3d 444, 449 (7th Cir. 2015) (deeming mere possession of a

10

gun, without evidence that the suspect was a threat to others, insufficient to support use of deadly force).

At the relevant time, however, we and other courts had concluded there was qualified immunity where an officer made a split-second decision to use deadly force when he was immediately confronted by a suspect he reasonably believed might be armed. *See, e.g.*, *Lamont v. New Jersey*, 637 F.3d 177, 183 (3d Cir. 2011) (upholding use of deadly force where suspect who appeared to be clutching an object "suddenly pulled his right hand out of his waistband"); *McLenagan v. Karnes*, 27 F.3d 1002, 1007 (4th Cir. 1994) (granting qualified immunity where officer was "credibl[y] warn[ed]" that the suspect might be armed and needed to react when the suspect was "virtually upon him"); *Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir. 1993) (observing in dictum that use of deadly force "could be reasonable" if the officer was "disoriented and off-balance" due to a suspect's "risky and startling" conduct); *see also Robinson v. Arrugueta*, 415 F.3d 1252, 1254 (11th Cir. 2005) (finding use of force was not unreasonable where officer had less than three seconds to react to a car moving at "one to two miles per hour" that threatened to pin him).

In short, as the Court cautioned in *Brosseau*, "this area [of the law] is one in which the result depends very much on the facts of each case," 543 U.S. at 201, and, given the circumstances that Richardson confronted and the then-existing case law, we cannot say that a reasonable officer in his position would be on "notice that [this] specific use of force [was] unlawful," *Kisela*, 138 S. Ct. at 1153.

11

In so holding, we do not in any way diminish the tragic nature of the events that unfolded here or our appreciation of the diligent and thorough efforts of the District Court to sift through the evidence and to carefully consider the competing inferences it supported as to what Richardson himself perceived and his actual reasons for acting when he did. We simply recognize that, against the backdrop of the then-existing precedent and applying an objective standard as required, Richardson's "actions fell in the 'hazy border between excessive and acceptable force,'" *Brosseau*, 543 U.S. at 201 (quoting *Saucier*, 533 U.S. at 206) (internal quotation marks omitted), and the right he is alleged to have violated thus was not "clearly established." Richardson is therefore entitled to qualified immunity at prong two.[2]

---

[2] Our conclusion that Richardson is entitled to federal qualified immunity warrants the dismissal of all remaining Counts against the VI Defendants. As for the common law claims against Richardson, qualified immunity under Virgin Islands law rises and falls with federal qualified immunity. *Nibbs v. Roberts*, No. 1991-029, 1995 WL 78295, at *7 (D.V.I. App. Div. Feb. 8, 1995) ("Under the common law and the Supreme Court's section 1983 decisions, government officials sued in their individual capacities are entitled to the defense of qualified immunity."); *Int'l Islamic Cmty. of Masjid Baytulkhaliq, Inc. v. United States*, 981 F. Supp. 352, 366 (D.V.I. 1997) ("For suits against law enforcement officers arising under Virgin Islands law, the requisites of an immunity defense are identical to the federal bases for immunity. . . ."). And as for the claims against the Superior Court and the Government of the Virgin Islands, the VITCA "merely reflects the 'basis to extend the liability of [Richardson's] underlying torts'" to those entities, so our conclusion that Richardson is free from liability is dispositive of those claims. *Russell I*, 905 F.3d at 246 n.5 (quoting *Bonelli v. Gov't of the Virgin Islands*, No. ST-13-CV-175, 2015 WL 1407259, at *5 (V.I. Super. Ct. Mar. 19, 2015)). Presumably for those reasons, the VI Defendants maintained below and on appeal that granting federal qualified immunity to Richardson necessitates the dismissal of all remaining Counts, and Appellees have raised no challenge to that position.

**III. Conclusion**

For the foregoing reasons, we will reverse the District Court's denial of qualified immunity and will remand the case with instruction to dismiss all remaining Counts against the VI Defendants.