**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 18-3310
_____

ERIKA EBERHARDINGER

v.

CITY OF YORK; BENJAMIN SMITH; MATTHEW FOSTER;
STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY;
STATE FARM FIRE AND CASUALTY COMPANY;
STATE FARM INSURANCE COMPANY;
STATE FARM COMPANIES; STATE FARM; STATE FARM INSURANCE


BENJAMIN SMITH,
Appellant
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 1-16-cv-02481)
District Judge: Hon. Christopher C. Conner
_____

Submitted Under Third Circuit LAR 34.1(a)
July 9, 2019

Before: SHWARTZ, KRAUSE, and FUENTES, *Circuit Judges*

(Opinion filed: August 5, 2019)

KRAUSE, *Circuit Judge*.

This case concerns a police chase that ended with Defendant-Appellant Officer Benjamin Smith shooting and wounding Plaintiff-Appellee Erika Eberhardinger. Eberhardinger sued Smith for use of excessive force in violation of her Fourth Amendment rights, and Officer Smith moved for summary judgment on qualified immunity grounds, which the District Court denied.

On appeal, Officer Smith argues that his actions did not violate "clearly established" Fourth Amendment law and that, therefore, he is entitled to qualified immunity. *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015). Because we conclude under our prior decision in *Abraham v. Raso*, 183 F.3d 279 (3d Cir. 1999), that there are genuine issues of material fact for a jury to decide and the conduct alleged, if proven at trial, would violate clearly established law, we will affirm.

## I. Background

This case centers on a police chase that began when, around 2:00 am, Officer Benjamin Praster spotted a car running a stop sign. In the car were Matthew Foster (the driver), Erika Eberhardinger (sitting in the front passenger seat), and Mason Millen (sitting in the back seat). Officer Praster started tailing the car after it ran the stop sign,

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

which apparently rattled Foster and prompted him to speed up. When Foster's speed increased, Officer Praster flipped on his lights and siren and attempted to pull the car over. Foster had been drinking and did not have a valid driver's license, and he did not pull over. Instead he accelerated in an effort to evade Officer Praster, who continued to follow the fleeing car and radioed for backup.

A nearby officer, Benjamin Smith, then joined the pursuit. Officer Smith proceeded toward the action in his cruiser, tracking updates from Officer Praster to discern the chase's location. In a matter of minutes, Officer Smith spotted the fleeing car when he turned onto West Gay Street—a narrow one-way street with a guardrail on one side and a line of parked cars on the other—where he found himself facing Foster's vehicle driving toward him, with Officer Praster trailing behind it. Officer Smith quickly came to a stop, obstructing Foster's path. When Foster noticed Officer Smith's cruiser ahead of him, blocking his exit from the narrow street, Foster stopped his car, put it in reverse, and began driving backward. Officer Smith immediately exited his vehicle, ran toward Foster's car, drew his firearm, and shouted commands at Foster to get out of his car.

At this point, the parties disagree about the details of what unfolded. It is undisputed that, as Foster continued in reverse, he struck a telephone pole behind him and, after crashing into the pole, he switched directions again and started driving in the general direction of Officer Smith, who was on foot. But the parties dispute how suddenly the car started moving, how fast Foster was driving, and whether Officer Smith was standing in the car's path, or rather, safely to the side of the car's course. Central to

3

the issue on appeal, the parties also dispute precisely when, as the car moved toward Smith, he began shooting his gun at Foster's vehicle, which he fired four times in rapid succession, hitting Eberhardinger twice.

According to Eberhardinger, Officer Smith fired all four shots while "standing to the left of the slow-moving vehicle and out of harm's way . . . as the vehicle was passing him or had completely passed him." Appellee's Br. 6. Officer Smith, by contrast, contends that he began firing while still in front of the car as he was "running [out of the way] to avoid the approaching vehicle" and stopped firing as soon as "the vehicle passed him completely." Appellant's Br. 9.

Eberhardinger sued Officer Smith pursuant to 42 U.S.C. § 1983 for use of excessive force in violation of her Fourth Amendment rights. After discovery, Officer Smith moved for summary judgment on qualified immunity grounds, which the District Court denied. The District Court concluded, based primarily on video footage of the shooting and other evidence relating to the angle of the gunshots, that "[v]iewing the facts . . . in a light most favorable to Eberhardinger," *Eberhardinger v. City of York*, 341 F. Supp. 3d 420, 432 (M.D. Pa. 2018), did not support entry of summary judgment on the basis of qualified immunity. Looking at the facts in that light, the District Court determined that a reasonable jury could find that "[a]fter striking the telephone pole . . . Foster . . . began moving forward at a slow rate of speed down West Gay Street"; that "Officer Smith moved out of the middle of the street and took up a position several feet to the left of the vehicle a few seconds before the vehicle reached him"; that the "forward-moving vehicle was not pointed in Officer Smith's direction when he began

4

firing"; and that "Officer Smith—standing to the left of the slow-moving vehicle and out of harm's way—fired four shots at the driver as the vehicle was passing him or had completely passed him." *Id.* at 433.

Thus, the District Court concluded that a reasonable jury could find Officer Smith "used deadly force to stop the fleeing suspect rather than out of fear of immediate personal harm," *id.*, which violated clearly established Fourth Amendment law. In the District Court's view, this scenario presented the "'obvious case' where general excessive force principles" found in *Graham v. Connor*, 490 U.S. 386 (1989), and *Tennessee v. Garner*, 471 U.S. 1 (1985), gave "'fair and clear warning' that Officer Smith's conduct," viewed in the light most favorable to Eberhardinger, "violated federal law." *Eberhardinger*, 341 F. Supp. 3d at 433 (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018)). This interlocutory appeal followed.

## II. Discussion[1]

Qualified immunity shields police officers from claims for money damages brought pursuant to § 1983 "so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Bland v. City of Newark*, 900 F.3d 77, 83 (3d Cir. 2018) (quoting *Mullenix*, 136 S. Ct. at 308). The Supreme Court has articulated "general tests" to determine what conduct constitutes excessive force under the Fourth Amendment, but, where there is otherwise

---

[1] The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367. This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291 under the collateral order doctrine. *See Bland v. City of Newark*, 900 F.3d 77, 82 (3d Cir. 2018).

no "body of relevant case law" that establishes an officer's conduct is unlawful, courts may not rely on those tests to "'clearly establish' the answer" except in an "obvious case." *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004).

Here, Officer Smith argues on appeal that, contrary to the District Court's reasoning, this is not an "obvious case," and, as primary support for that argument, posits that the evidence does not support the District Court's account of the facts. That argument suffers from two critical flaws: (A) because this is an interlocutory appeal from a summary judgment order denying qualified immunity, whether the District Court's construction of the facts finds adequate support in the record is beyond our jurisdiction, *see Johnson v. Jones*, 515 U.S. 304, 313 (1995), and (B) accepting the District Court's rendition of the facts, even assuming that this is not an "obvious case," our prior decision in *Abraham v. Raso*, 183 F.3d 279 (3d Cir. 1999), where we confronted very similar factual circumstances, clearly established that Officer Smith's conduct, as alleged by Eberhardinger, violated her Fourth Amendment rights.[2]

---

[2] Officer Smith also argues on appeal that Officer Smith cannot be found to have violated Eberhardinger's constitutional rights under clearly established law because such a conclusion would be inconsistent with Foster having pleaded nolo contendere to, among other offenses, reckless endangerment. To support this position, he cites *Heck v. Humphrey*, which held that "in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed" or otherwise invalidated. 512 U.S. 477, 486–87 (1994). But *Heck* concerned the relationship between a prisoner's criminal conviction and his own § 1983 suit, *id.* at 478–79, and it has been applied to bar a *third party's* § 1983 suit only where the convict was the third party's accomplice, *see Beets v. County of Los Angeles*, 669 F.3d 1038, 1048 (9th Cir. 2012) (holding that "where more than one person engages in a concerted criminal act during the course of which one of the criminals is killed by the police, then when the propriety of the officer's action is critical

6

### A. Scope of Our Jurisdiction

In an interlocutory appeal from a denial of summary judgment on the basis of qualified immunity, this Court lacks jurisdiction to review questions of "'evidence sufficiency,' i.e., which facts a party may, or may not, be able to prove at trial." *Johnson*, 515 U.S. at 313. Put differently, we may not "consider whether the district court correctly identified the set of facts that the summary judgment record is sufficient to prove," *Bland*, 900 F.3d at 82 (quoting *Dougherty v. Sch. Dist. of Phila.*, 772 F.3d 979, 986 (3d Cir. 2014)), and therefore "must accept the District Court's set of facts as given," *Walker v. Horn*, 286 F.3d 705, 707 (3d Cir. 2002).

Officer Smith acknowledges this but nevertheless urges us to disregard the District Court's version of the facts in light of the camera footage showing the shooting and the moments leading up to it. It is true that video evidence sometimes enables an appellate court to disregard a district court's construction of the facts on interlocutory appeal. *See Scott v. Harris*, 550 U.S. 372, 379–80 (2007). But that is only the case where a videotape "blatantly contradict[s]" the District Court's account. *Blaylock v. City of Philadelphia*, 504 F.3d 405, 414 (3d Cir. 2007) (quoting *Scott*, 550 U.S. at 380).

Here, the video evidence falls short of showing that the District Court's

---

to the conviction of a surviving criminal, and the deceased's interests in the issue are in no way inconsistent with the surviving criminal's interest in the issue," the *Heck* doctrine may apply); *see also Hayward v. Cleveland Clinic Found.*, 759 F.3d 601, 616 (6th Cir. 2014) ("*Heck* does not apply to third-party § 1983 claims."). That is not the case here, so regardless of whatever relevance Foster's conviction may have at trial, it does not dictate a different result in our review of the District Court's qualified immunity determination.

7

determination that material facts are subject to "reasonable dispute [was] blatantly and demonstrably false." *Id.* In particular, and of primary importance to this appeal, the footage does not unequivocally corroborate Officer Smith's assertion that he "was in front of the vehicle and not safely out of the way at the time he began discharging his firearm." Appellant's Supp. Br. 2. In the moments before the sounds of gunfire, Officer Smith can be seen in the path of Foster's vehicle, then moving to the side and out of the vehicle's path, and ultimately standing to the left of Foster's car as it passes him closely. Because we cannot discern with certainty from the video where Officer Smith was positioned vis-à-vis the oncoming car when he opened fire—and thus whether a reasonable officer in his position would believe himself in danger—we cannot say the video evidence "blatantly and demonstrably" disproves that there are disputed issues of material fact. *Blaylock*, 504 F.3d at 414.[3]

Thus, our inquiry into whether Officer Smith's conduct violated clearly established law must assume, as the District Court construed the facts at summary judgment, that Officer "Smith—standing to the left of the slow-moving vehicle and

---

[3] Officer Smith also relies on evidence relating to the location of the bullet-holes in Foster's vehicle to undermine the District Court's view of the facts. But even assuming that we could consider this type of evidence in the same way as video evidence, *see Blaylock*, 504 F.3d at 414, it also would be insufficient to establish a "blatant[] contradict[ion]" here, *id.* The police report—which discusses a search of Foster's vehicle for bullets, but does not seem to reflect any laboratory analysis—indicates that one bullet struck the hood of Foster's car, another struck the left side of the windshield, a third struck the rear driver's side door, and the fourth is believed to have travelled through the driver's side window. While the report reflects that the first two bullets came from the front-left direction of the vehicle, that is not necessarily inconsistent with Smith having fired after it was already apparent from his perspective that he was no longer in the car's path.

apparently out of harm's way—fired four shots at the driver as the vehicle was passing him or had completely passed him." *Eberhardinger*, 341 F. Supp. 3d at 433.

## B. Whether Officer Smith's Conduct Violated Clearly Established Law

Having established that we "must accept the District Court's set of facts as given," *Walker*, 286 F.3d at 707, we now turn to analyzing whether those facts, if proven at trial, would reflect a violation of clearly established law.[4] Our decision in *Abraham v. Raso*, 183 F.3d 279 (3d Cir. 1999), leads us to conclude that they do.

There, we considered whether Kimberly Raso, an off-duty police officer serving as a mall security guard, used excessive force when she shot a shoplifter, Robert Abraham, who was attempting to flee the mall in his car with stolen goods in tow. *See id.* at 282. Although the episode in *Abraham* began somewhat differently than our facts here—as Raso's pursuit of Abraham started on foot rather than in a high-speed chase and only later involved a car-getaway, *see id.* at 283—the case presents a markedly similar flash point leading up to the shooting: Raso, on foot, faced head-on the suspect's car coming at her shortly before she opened fire, *see id.* at 284–85. Like the District Court determined here, we concluded in *Abraham* that a reasonable jury could find Raso did not fire until the car had missed her and that she shot at the suspect from the side of the vehicle, at which point it would not be objectively reasonable to use deadly force. *See id.* at 294–95. Our holding that a reasonable jury could find on that record that Raso used excessive force was sufficient to give "[O]fficer [Smith] fair notice that [his alleged]

---

[4] We review this issue de novo. *See Bland*, 900 F.3d at 83.

9

conduct was unlawful."[5]  *Brosseau*, 543 U.S. at 198.

The relevant details that bring us to that conclusion come during the final moments before Raso shot Abraham, when he had successfully eluded her and other security guards on foot, finding his way to his car in the mall parking lot and starting the engine.  *See id.* at 283–84.  As he began backing out of the parking space, according to Raso, she was standing near the rear driver's side of the car, having already repeatedly commanded him to stop.  *See id.* at 283.  The vehicle launched backward, striking with its rear bumper a Ford Mustang parked in the adjacent row of cars.  *See id.*  Raso claimed she had to jump out of the way to dodge the car when it reversed.  *See id.*  After Abraham's car collided with the Mustang, Raso purportedly moved in front of Abraham's vehicle, blocking his path forward, and drew her weapon.  *See id.* at 284.

At this juncture, the facts of *Abraham* begin to parallel the District Court's construction of the facts here almost exactly.  With Raso positioned somewhere to the front of Abraham's car, the vehicle lunged forward, and Raso fired a single shot that killed Abraham.  *See id.* at 284–85.  As here, the parties disputed precisely where Raso was standing when she fired and how quickly Abraham accelerated:  Raso argued that she was right in front of the car and was even struck by the car as she tried to jump out of the way, while Abraham's estate asserted that Raso "shot him from the side as he drove away."  *Id.* at 285.  We determined that a reasonable jury could find, based on ballistics

---

[5] Broadly speaking, "[w]here the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so."  *Garner*, 471 U.S. at 11.

10

evidence and witness testimony, that she "had time to get out of the way, take aim, and fire" from the side of the vehicle. *Id.* at 294.

Given that potential finding by a jury—which is a close analogue to the potential here for a jury to find that Officer Smith was "standing to the left of [Foster's] slow-moving vehicle and apparently out of harm's way" and fired the shots "as the vehicle was passing him or had completely passed him," *Eberhardinger*, 341 F. Supp. 3d at 433—we held that a reasonable jury could further find that Raso "did not fire until it was no longer objectively reasonable for her to believe she was in peril," *Abraham*, 183 F.3d at 294, and therefore violated Abraham's Fourth Amendment rights through use of excessive force. That held true "[e]ven assuming Raso was in front of the car and was in danger at some point" because "[a] passing risk to a police officer is not an ongoing license to kill an otherwise threatening suspect." *Id.* at 294. Other Courts of Appeals have reached the same conclusion in the specific context of a car chase, as we are presented with here, concluding that "[i]t has long been clearly established that, absent any justification for the use of force, it is unreasonable for a police officer to use deadly force against a fleeing felon who does not pose a sufficient threat of harm to the officer or others." *Lytle v. Bexar County*, 560 F.3d 404, 417 (5th Cir. 2009); *Kirby v. Duva*, 530 F.3d 475, 483 (6th Cir. 2008) ("[D]eadly force cannot be used against an escaping suspect who does not pose an immediate danger to anyone."); *Adams v. Speers*, 473 F.3d 989, 993 (9th Cir. 2007) (holding "[n]o officer acting reasonably in these circumstances could have believed that he could use deadly force" to stop a fleeing driver in car chase without warning and where there was no danger to the shooter); *Smith v. Cupp*, 430 F.3d 766, 777

(6th Cir. 2005) ("[A] suspect fleeing in a car that has never posed a danger to anyone has the clearly established right not to be seized with deadly force."); *see also Tubar v. Clift*, 453 F. Supp. 2d 1252, 1258 (W.D. Wash. 2006) (describing clearly established right not to be shot in a slowly moving car that poses no immediate threat to an officer or others).

That logic applies with equal force here if we accept, as we must, the District Court's determination of what facts could be found by a reasonable jury, including that by the time Foster and the officers reached West Gay Street, "[t]he suspect's vehicle was 'boxed in' by the police cruisers of Officer Smith and Praster, cutting off any exit"—i.e., there was no real risk that the chase could continue—and "[t]here were no other occupied vehicles, bystanders, or pedestrians in the immediate area." *Eberhardinger*, 341 F. Supp. 3d at 433. With the high-speed pursuit at its terminus and the absence of any danger to bystanders, the only plausible justification for deadly force then would be the threat to the safety of the officers. In that regard, while Officer Smith tries to draw distinctions between that account and the circumstances in *Abraham*, none is availing. At bottom, each purported distinction is not a difference between *Abraham* and the District Court's construction of the facts, but rather, a disagreement with the construction itself based on the record. As explained above, such arguments extend beyond our jurisdiction

Accordingly, we will not disturb the District Court's determination that, viewing the facts in the light most favorable to Eberhardinger, a reasonable jury could find that Smith's use of deadly force violated clearly established law, and that summary judgment on the issue of qualified immunity was therefore properly denied.

**III.    Conclusion**

For the aforementioned reasons, we will affirm the District Court's order denying summary judgment.